the mafia?

A    I don't remember how long we went with him.

Q    But, after that conversation, you continued to travel with him, just you and your sister?

A    Yes, sir.

Q    Mrs. Austin, the night that, you said you were married?

A    Yes, sir.

Q    Is your name still Austin?

A    It was Taylor, but I got married, so now it is Austin.

Q    Mrs. Austin, the night that Stanley picked you and Rachel up, do you remember what time it was?

A    Around 4:00 or 5:00.

Q    You say he picked you up in Enterprise?

A    Yes.

Q    Who were you living with at the time?

A    My father.

Q    Who else lived in the house with you and your father?

A    My dad's girlfriend at the time and my half-brother and sister and my sister Rachel.

Q    Living in the house with you and your father was his girlfriend at the time?

A    Uh-huh.  (Affirmative response.)

Q        Rachel and who else?

A        My little sister and brother.

Q        How old is your little sister?

A        She is three.

Q        How old is your brother?

A        Four.

Q        Heather, do you remember giving a statement to the

         police?

A        Yes, sir.

Q        And - - -

                 MR. BLUMENFELD:   May I approach the

         witness, Your Honor?

                 THE COURT:   Yes, sir.

                 MR. BLUMENFELD:   Thank you.

BY MR. BLUMENFELD:

Q        Do you remember giving this answer to this

         question:

                 All right.  So, y'all guys are traveling

                 to go to this auction and then what

                 happened?

         That was the police officer asking you the

         question.

A        Yes.

Q        Do you remember this answer:

                 We stopped in Bonifay at a gas station.

MR. DAVIS:  I am going to object.  If he

is trying to refresh her recollection, he has not

asked the first question about that in the first

place.

MR. BLUMENFELD:  All right.

BY MR. BLUMENFELD:

Q     Do you remember being questioned by the police

department?

A     Yes, sir.

Q     And, do you remember telling the police department

that, telling them:

He pulled a gun and said if we didn't go

back to Dothan with him and have sex with

him that he was going to kill our family.

Do you remember that?

A     No, sir.  What happened is - - -

Q     No.  No.  Do you remember giving that statement to

the police?

A     Yes, sir.

Q     Is it correct to say that in a statement you gave

the police, Mrs. Austin, you never said anything

about the mafia?

A     No, sir.

Q     That is incorrect?

A     No.  I didn't say nothing about the mafia.

Q    So, in all the conversations you had with the
     police that allege Stanley was going to kill a
     member of your family, you always said Stanley,
     you never mentioned the mafia, did you?

A    No, sir.

Q    Now, when you arrived - - - now, at the gas
     station, there was a gas station outside of
     Bonifay?

A    It was in Bonifay.

Q    In Bonifay?

A    Yes, sir.

Q    You understand Bonifay is in the State of Florida?

A    Yes, sir.

Q    Was the gas station around a lot of people?

A    (No response.)

Q    Let me withdraw and ask this question.  Bonifay is
     a very small town, is it not?

A    Yes, sir.

Q    It is not like Dothan, not like Enterprise?
     Correct?

A    No, sir.

Q    So, where there any other buildings around this
     gas station?

A    Yes, sir.  It was a Hardees in front of the gas
     station.

Q    Was the gas station open or closed?

A    Open.

Q    But, you went to the back, he drove y'all to the back?

A    He didn't drive us to the back.  My sister drove.

Q    Rachel drove to the back of the gas station?

A    Yes, sir.

Q    Then you come to the Holiday Inn in Dothan?

A    Yes, sir.

Q    He didn't park in back of the Holiday Inn, did he? Based on your statement, y'all didn't park at the back of the Holiday Inn did you, Mrs. Austin?

A    No, sir.

Q    In fact, you parked where people would check in at the motel?  Is that right?

A    Yes, sir.

Q    How long did it take for Stanley to check in?

A    Oh, it was not long.  I don't know exactly how many minutes it was, but it wasn't that long.

Q    The gun was in the truck?

A    Yes, sir.

Q    You know of no other guns he had with him?

A    No.

Q    And, there were people in the motel?

A    Yes, sir.

Q      There are a lot of things around that motel,
aren't there?

A      Yes, sir.

Q      There is the Dobbs Bar-B-Q across the street and I
know there is a four lane highway there, isn't it?

A      Yes, sir.

Q      But, there is also a little shopping center next
to the motel, isn't there?  A big shopping center,
isn't it?

A      I am not really familiar with Dothan.  I don't
know.

Q      There was a lot of things around that motel,
wasn't there?

A      Yes, sir.

Q      Do you remember Winn Dixie being there?

A      I don't recall.  I don't remember.  I am not
familiar with Dothan that much.

Q      But, there were a lot of things around that motel?
Correct?

A      Yes, sir.

Q      There are a lot of people around that motel?
Correct?

A      Yes, sir.

Q      Then you went to Ruby Tuesdays?

A      Yes, sir.

Q     There were people at the restaurant?

A     Yes, sir.

Q     During that time, did you or Rachel go to the
      restroom?

A     No, sir.

Q     You stayed in the motel - - - I am sorry, I
      withdraw.  You stayed at the restaurant?

A     Yes.

Q     Did you have something to eat?

A     Yes, sir.

Q     Something to drink?

A     Yes, sir.

Q     I don't mean alcoholic beverages.

A     No, sir.

Q     Did you have tea or soda?

A     Yes, sir.

Q     Do you remember what you ate that night?

A     I don't remember.

Q     Stanley bought you a meal?

A     Yes, sir.

Q     And, you ate it?

A     Yes, sir.

Q     After that, I believe in a statement you gave the
      police, you said that Stanley came to the house
      several times to visit your family.  Is that

correct?

A    Yes, sir.

Q    Are the same people living at the house then as
     when he picked you up?  Was the household the
     same, your little brother and little sister?

A    At the time, yes.

Q    And, your dad and - - -

A    Yes, sir.

Q    And, his girlfriend.  Do you know how many times
     Stanley came to the house?

A    Really not that much.  Not really.

Q    Was it more than once?

A    It was more than once.

Q    More than twice?

A    More than twice.

Q    More then tree times?

A    Yes.

Q    I know I could keep on going forever, but do you
     remember, do you really know how many times?

A    I - - - I - - -

Q    Could it be at least half a dozen times?

A    Probably so.

Q    Maybe ever more?

A    Probably.  Probably about fifteen, twenty times.
     I mean it was not really that much.

Q    Fifteen or twenty times?

A    Yes.

Q    After this happened?  In your statement to the police, you never mentioned this again, did you, after this night?  You never mentioned anything?

A    No, sir.

Q    Never mentioned the word mafia?

A    No.

Q    Or even tried to in any way hint any type of danger to you or Rachel, did you?

A    No, sir.

Q    Do you remember telling the police, Mrs. Austin, that if your sister hadn't initiated telling someone about this, you probably wouldn't have told anyone.  Do you remember that?

A    I don't remember saying that.

Q    Okay.  But, you didn't tell someone until after Rachel had told someone?  Correct?

A    I told my husband first and then my sister told her boyfriend and then they told my father.

Q    When did you get married?

A    April 26, 2002.

Q    So, the day, the day before you married your husband - - -

A    Uh-huh.  (Affirmative response.)

Q - - - you told him that you got raped?

A Yes, sir.

Q Mrs. Austin, do you remember telling the police that you want Stanley to go to trial?

A Yes, sir.

Q You are angry about what he did to you?

A What did you say again?

Q You are angry about what he did to you?

A Yes.

Q You are bitter about what he did to you?

A Yes, sir.

Q Makes you sick for what he did to you?

A Yes, sir.

Q But, in the time this happened until the night before you got married, you never told your father?

A No, sir.

Q Now, is your mother still living?

A Yes, sir.

Q Never told your mother?

A No, sir.

Q Never told your grandmother?

A No, sir.

Q Never told a rape counselor?

A No, sir.

Q      You never told your pastor?

A      No, sir.

Q      In answer to Mr. Davis' questions about the gun,

       you really couldn't describe the gun?

A      No, sir.

Q      You have never seen this hit man from the mafia,

       have you?

A      No, sir.

Q      All right.

              MR. BLUMENFELD:  That is all, Your Honor.

              THE COURT:  Thank you.  Redirect, briefly,

       Mr. Davis?

              MR. DAVIS:  Yes, sir, Your Honor.

                   REDIRECT EXAMINATION

BY MR. DAVIS:

Q      Mr. Blumenfeld asked you about traveling with Mr.

       Caudill after he brought up the mafia the first

       time?

A      Yes, sir.

Q      I believe - - - did he tell you the first time

       that they might kill you?

A      No, sir.

Q      How many times did he ever say anything about the

       mafia killing a family member?

A      Just that one time.  That was all.

Q     We are talking about in Bonifay before he made you

      go have sex with him?  Correct?

A     Yes, sir.

Q     Mr. Blumenfeld asked about the statement whether

      he said he would kill you or a family member or

      the mafia would kill a family member.  Was it your

      belief that he would have somebody in the mafia

      kill a family member if you didn't do what he

      said?

A     Yes, sir.

Q     Mr. Blumenfeld asked you about people at the store

      in Bonifay, the motel and Ruby Tuesday.  Did you

      know any of those people?

A     No, sir.

Q     Mr. Blumenfeld asked about how many times Mr.

      Caudill came over to your family house and there

      was a number, I don't recall, but did you and

      Rachel go anywhere with him after this happened?

A     No, sir.  We did not go with him after this

      happened.

Q     Mr. Blumenfeld asked if you were angry and bitter

      and you said yes.  Would it be fair to say that

      you tried to forget this?

A     Yes, sir.

Q     It wasn't a pleasant experience, was it?

A       No, sir.

MR. DAVIS:  Judge, with the exception of the tape, that is all the questions I have at this point.

THE COURT:  Recross, briefly, Mr. Blumenfeld?

MR. BLUMENFELD:  No, Your Honor.

THE COURT:  Miss, you may step down.  Be careful as you leave your seat there.

(Witness excused.)

THE COURT:  Ladies and Gentlemen, this may be a good time to take a brief recess before we get into another witness.  Because, once we do, it will take a while.  It is 10:20; if you will, go the Jury Deliberation Room and remember not to discuss this case among yourselves or allow anyone to discuss it with you.  Of course, if you need soft drinks or something, a cup of coffee, help yourself.  Thank you.

(Thereupon, the Trial Jury proceeded to the Jury Deliberation Room with the above instructions from the Court and the following proceedings were held out of the presence and hearing of the Trial Jury, to-wit:)

THE COURT:  Let's take about a ten minute
recess.

(Thereupon, a recess was called and taken
by all parties.  Upon completion of said
recess, all parties returned to the Court
Room and the following proceedings were
held, to-wit:)

MR. DAVIS:  Before we have them come in,
as is my usual practice, I ask to distribute these
and if you want to look over them and make sure
there are no marks or anything.  I provided Mr.
Blumenfeld a copy that was made at the same time
that was.  (Produces some documents for
examination.)

THE COURT:  (Studies the documents in
question.)  You have not marked on yours, have
you?

MR. DAVIS:  No, sir.  There are no marks
on the original, either.  At least not yet.  All
the copies were made at the same, anything made
for distribution to you, him or them - - -.

THE COURT:  Okay.  Bring in the Jury.

(Thereupon, the Trial Jury was returned to
their places in the Jury Box and the
following proceedings were held, to-wit:)

THE COURT:  Back in the hearing and presence of the Jury.  All thirteen Jurors have returned, the parties and respective attorneys are present.

Ladies and Gentlemen, the State has recalled their witness, Heather Austin.  And, with that, Mr. Davis, proceed.

MR. DAVIS:  Judge, at this time, I move to admit State's Exhibit 1, which is the tape and be allowed to play it.

THE COURT:  Any objections to State's Exhibit 1?

MR. BLUMENFELD:  No, judge.

THE COURT:  All right.  It is admitted without objection.

(Thereupon, State's Exhibit Number 1 was received in evidence.  After that, the following proceedings were held, to-wit:)

MR. DAVIS:  What, at this time what I have had marked as State's Exhibit Number 2 for identification purposes only, if I may distribute copies to the Jurors so they can follow along with the tape as it is played.

THE COURT:  Are you offering State's Exhibit 2?

MR. DAVIS: Yes, sir. For that purpose. I realize it doesn't go back.

THE COURT: Any objection to State's Exhibit Number 2, which purports to be a transcript?

MR. BLUMENFELD: No, Your Honor.

THE COURT: All right. State's Exhibit Number 2 is admitted without objection. Distribute your copies.

(Thereupon, State's Exhibit Number 2 was received in evidence with copies being distributed to the Jurors. After that, the following proceedings were held, to-wit:)

THE COURT: While he is doing that, Ladies and Gentlemen, for the sake of convenience, the State is passing out copies of what purports to be a transcript. I assume a transcript of the conversations that took place on this tape. Please understand that in a transcript, there will inevitably be errors, some typographical in nature and from time to time I have seen where the transcriptionist says inaudible. Understand that this transcript is not evidence, per say. It is not something that will go back with you. The

tape is evidence, so listen carefully to the tape.

The transcripts are just for your convenience so

you may follow it as best you can.  But as I said,

the transcript contains errors, could contain

typographical errors and other errors.

So, with that, you may proceed, Mr. Davis.

Thereupon,

<u>HEATHER AUSTIN</u>

was recalled as a witness on behalf of the

State of Alabama, and after having been first duly

sworn, testified as follows, to-wit:

<u>DIRECT EXAMINATION</u>

BY MR. DAVIS:

Q      Mrs. Austin, just for your recollection, State's

Exhibit Number 1 is a tape of that conversation

you had with Mr. Caudill on June 8 of this year?

Is that correct?

A      Yes, sir.

(Thereupon, State's Exhibit Number 1 was

played in open court.  After that, the

following proceedings were held, to-wit:)

THE COURT:  Pick up the transcripts,

please.

(Thereupon, the Jurors' copies of State's

Exhibit Number 2 were returned to the

Court Reporter.  After that, the following

proceedings were held, to-wit:)

BY MR. DAVIS:

Q      Heather, let me ask a few more questions, please.

He made the statement on here about this group and

these people; do you know what he was talking

about?

A      That - - -

          THE COURT:  Pull the microphone up,

please.

          THE WITNESS:  He was talking about the

mafia.

BY MR. DAVIS:

Q      How long were you in the motel?

A      Probably about ten minutes.

Q      Okay.  You said fifteen on there; ten, fifteen

minutes, is he right about that part of the tape?

A      Yes, sir.

Q      Now, he makes statements in here about trying to

save himself, doing something he didn't want to;

did he ever make any statement to you at any time

why he was doing what he did?  Did he ever explain

statements like that?

A        No, sir.

Q        He also, in that phone conversation, states he

         apologized one thousand times.  Did he ever

         apologize for what had happened that you recall?

A        I don't remember.

Q        Did he ever tell you that he had no choice in what

         he was doing, like he said in this phone

         conversation?

A        I don't remember that, you know, him saying

         anything about that.

                 MR. DAVIS:  No more questions.

                 THE COURT:  Thank you.  I guess it will be

         Cross Examination again.

                 MR. BLUMENFELD:  Briefly, judge.

                        CROSS EXAMINATION

BY MR. BLUMENFELD:

Q        Mrs. Austin, who set this up?

A        Me and the detective.

Q        The detective was in the room when you were there?

A        Yes.

Q        Were they prompting you with questions?

A        Yes, sir.

Q        Did they ever ask you to ask him to elaborate

         about the group?

A        No, sir.

Q     You never said it was the mafia, did you?

A     No, sir.

Q     Who is the head of the mafia here in this

      community?  Do you know?

A     I don't know.

Q     What is the mafia?

A     I really don't know.

Q     Okay.  And, when you asked him or when you told

      him or he told you:

              Heather, I know you are recording

              this - - -

      And, you said:

              No, I am not - - -

      That was not true, was it, obviously?

A     No, sir.

Q     And, you kept - - - did the officer keep prompting

      you to ask him did you have sex, did you have sex,

      the officer kept prompting you on that?

A     Yes, sir.

Q     They kept feeding you questions, didn't they?

A     (No response.)

Q     You were being told questions and that is why some

      of the pauses were so long, wasn't it?

A     No.  I was asking him questions, too, by myself.

Q     But, there were some times police officers

prompted you with questions?

A    Yes, sir.

Q    They were trying to set him up, weren't they?

A    Yes, sir.

Q    Every time the Ladies and Gentlemen heard it and they read it; he denied having sex with you, didn't he?

A    He denied what?

Q    He denied having sex with you, did he not?

A    Yes, sir.

        MR. BLUMENFELD:  Thank you, Your Honor.

        THE COURT:  Thank you.  Anything else, Mr. Davis, briefly?

### REDIRECT EXAMINATION

BY MR. DAVIS:

Q    When he denied having sex with you, was he telling the truth?

A    No, sir.

        MR. DAVIS:  No more questions.

        THE COURT:  Thank you.  Anything else, Mr. Blumenfeld?

### RECROSS EXAMINATION

BY MR. BLUMENFELD:

Q    You told him it was not being recorded; were you telling him the truth?

A        No, sir.

         MR. BLUMENFELD:  Thank you, Your Honor.

         THE COURT:  Anything else, gentlemen?

         MR. DAVIS:  No, sir.

         THE COURT:  All right.  Miss, you may step down.  Be careful with the steps there.

         (Witness excused.)

         THE COURT:  Call your next witness.

         MR. DAVIS:  Call Rachel Taylor Mitchell.

Thereupon,

### RACHEL TAYLOR MITCHELL

         was called as a witness on behalf of the State of Alabama and after having been first duly sworn, testified as follows, to-wit:

### DIRECT EXAMINATION

BY MR. DAVIS:

Q        Tell the Ladies and Gentlemen your name, please.

A        Rachel.

Q        Your full name.

A        Okay.  Rachel Mitchell.

Q        Okay.

         THE COURT:  I am sorry; what was that?

         THE WITNESS:  Rachel Mitchell.  I got married.

BY MR. DAVIS:

Q       When did you get married?

A       October 11, 2002.

Q       So, prior to then, you were Rachel Taylor?

        Correct?

A       Yes, sir.

Q       How old are you?

A       Eighteen.

Q       Can you tell us who your sister is?

A       Heather Michelle Taylor.

Q       Okay.  She has married, too?

A       Yes, sir.

Q       She is now Heather Austin?

A       Yes, sir.

Q       Tell us do you know Stanley Caudill?

A       Yes, sir.

Q       If you will, point him out for the Ladies and

        Gentlemen of the Jury, please.

A       Right there.  (Witness indicating toward the

        Defendant as requested.)

Q       Which of the two men, please.

A       The one in the striped shirt.

                MR. DAVIS:  Let the Record reflect she has

        indicated the Defendant.

BY MR. DAVIS:

Q    How do you know him?

A    We knew him from like the auction or whatever.

Q    Okay.  About how long?

A    Probably within about four years, maybe.

Q    Would it be fair to say he was a family friend?

A    Yes, sir.

Q    And, did you and Heather go places with him?

A    Yes.

Q    Okay.  What kind of places did y'all go with him?

A    Like to the auction.

Q    Let me take you back to April 17, 2001; does that particular date stick out in your mind?

A    Yes.

Q    Okay.  Who were you with?

A    My sister.

Q    Okay.  Were y'all going somewhere?

A    We was going to the auction.

Q    With whom?

A    With Stan and Heather and me.

Q    Where was this particular auction?

A    Steele City.

Q    What state is that in?

A    Florida.

Q    The very first part of the trip, was it fairly

uneventful?

A     Yes.

Q     At some point did that change?

A     Yes.

Q     Okay.  And, where was it that that changed?

A     (Witness crying.)  On the way to Florida.

Q     On the way to Florida?  Do you recall what

      particular place?

A     Talking about like the store or something?

Q     Where did everything change?  Talking about you

      said the first part was uneventful, where did it

      go from uneventful to eventful?

A     From like first to Florida at the store.

Q     Okay.  The store you mentioned, what is the store?

A     It is across the street from Hardees and I can

      still see it.  We were on the way to Steele City.

Q     Did you make it to Steele City?

A     Not to the auction.

Q     What town did you get to after Hartford?

A     I think it was Dothan.

Q     Did you ever go to Bonifay?

A     Yeah.

Q     Who was driving?

A     Me.

Q     Could the store have been in Bonifay?

MR. BLUMENFELD:  Judge, he is leading the witness.  I object.

THE COURT:  Sustained.

THE WITNESS:  Yes.

BY MR. DAVIS:

Q      And, how did you come to go to the store?

A      How did I come to go to the store?

Q      Did you stop there?

A      Yes.

Q      Why?

A      Because he said something about Heather having sex with him and going to a motel.

Q      Let me ask you this.  You were driving?

A      Yes.

Q      And, you stopped at a store?  Right?  Why did you stop at that store?

A      I had to.

Q      What was said to get you to stop there?

A      He was saying something about killing somebody or having sex or something like that.

Q      Let me back up.  You said you stopped at the store?

A      Yes.

Q      You were on the road and why did you turn in there?  Did you decide to turn in there or did he

tell you to turn in there?

A    I had no choice but to stop.

Q    Okay.  Why did you have no choice but to stop?

A    Because he wanted to make up our mind or
     something.  I don't know.  Going to a motel or
     something.

Q    Did he tell you why he wanted to go to the motel?

A    He said something about if you and your sister
     don't have sex with me, then I have to kill one of
     your family members or something like that.

Q    Did he say somebody was going to make him do it?

A    The mafia or something like that.

Q    Where was he seated in the truck?

A    On the passenger side.

Q    While y'all were stopped there at the store, did
     he show you anything?

A    He pulled out a gun from the glove box.

Q    Can you describe it in any way?

A    It was kind of big, black.

Q    Did he say anything about the gun?

A    Said something about if you don't have sex with
     me, I will kill somebody in your family.

Q    How did that make you feel?

A    Upset, scared.

Q    Where did you drive after you left the store?

A    I think he took over or something like that.

Q    What city?  Let me ask you this.  Did you keep
     driving?

A    No.

Q    You said he got the gun out of the glove box; did
     he put it back?

A    Yes.

Q    Do you know what city you went to next?

A    To Dothan.

Q    What particular kind of place did y'all go to?

A    To a motel in Dothan, the Holiday Inn South or
     something like that.

Q    Who got the room?

A    He did.

Q    Where were y'all parked in relationship to the
     front door of the motel?

A    Like where you could see out the door, whatever.

Q    Whatever?  Do you recall where the keys to the
     truck were?

A    He took them.

Q    Do you know whether you could have gotten to the
     gun or not?

A    No.

Q    Did you, at this point, try to get away from him?

A    I couldn't, because he had the keys, whatever.

And, we couldn't run or nothing.

Q        You didn't feel you could get away safely?

A        Yes.

Q        Did he come back to the truck?

A        Yeah.

Q        And, when he did, where did y'all go?

A        We went behind, like on the side of the motel,
         whatever.  Or, behind it to the room.

Q        When y'all got to the room, was there any light on
         that you recall?

A        No.

Q        Where in the room did you go first?

A        I think it was the little room or where the beds
         are.  Then to the, he told us to go to the
         bathroom or whatever and get undressed or
         something like that.

Q        When he told you to do that, did you go to the
         bathroom and get undressed like he said?

A        Yes.

Q        What happened after that?

A        I went in there first.

Q        Why did you go first?

A        I wanted to get it over with.

Q        What did you think was going to happen?

A        I don't know.

Q     Before you went there, he said something about having sex with you, hadn't he?

A     Yes.

Q     When y'all went to the room, did he have the gun?

A     He had it inside, next to the bed.

Q     When you went in there, could you see if or how he was dressed?

A     I think he was all the way naked lying in the bed or something like that.

Q     When you went in there, were you undressed?

A     Yes.

Q     When you went in, what did you do?  Let me back up; did he say anything first?

A     No.

Q     What did he do?

A     Well, he told me to lay down, so I did.  He started touching me in my private parts and it lasted maybe about five minutes.  Then I got up and went back to the bathroom and then my sister went in there.

Q     When you say private parts, I know this may be difficult; but, there are certain things we have to hear and have to know.  When you say he touched your private parts, what did he touch?

A     My boobs and my private area.

Q     When you say boobs, are you talking about breasts?
      Is that correct?

A     Yes.

Q     And, when you say vagina, I mean private part, are
      you saying vagina?

A     Yes.

Q     What did he touch those parts with?

A     His hands.

Q     You say it lasted about five minutes?

A     Yes, sir.

Q     And, you say you went back to the bathroom?
      Correct?

A     Yes.

Q     When he sent y'all back to the bathroom, was there
      a door back there where you could get out of the
      room?

A     No.

Q     How many doors were there to that room?

A     One.

Q     When you were in the bathroom and he was at the
      bed, was he between you and the door?

A     No.

Q     All right.  The front door is here and the
      bathroom is in the back; where were the beds?

A     There was a bed by the bathroom and a little space

where you walked right there.

Q    Uh-huh.   (Affirmative response.)

A    And then there is another bed and there is like
the front door.

Q    So, my left hand is the front door and my right
hand is the bathroom?

A    Right.

Q    Was he somewhere in between those two places?

A    In the bed next to the door.

Q    Okay.  You said Heather went in there; do you know
or recall about how long she was in there the best
you can recall?

A    I would say maybe ten minutes.

Q    Did she come back to the bathroom?

A    Yes.

Q    Then what happened?

A    We got dressed and we left.

Q    Where did you go after the motel?

A    I think we went to the Ruby Tuesday or something
like that.

Q    Who was driving at this point?

A    He was.

Q    What happened at Ruby Tuesday?

A    We got something to eat and then after we ate, we
left.

Q    While you were at Ruby Tuesday, did you or Heather
     in your presence, try to tell anybody what was
     going on?

A    No.

Q    Did either one of you get up from the table, that
     you recall?

A    No, sir.

Q    From Ruby Tuesday, you said you went home.  Was
     this to Enterprise?

A    Yes.

Q    Who was driving at this point?

A    He still was.

Q    After that particular date, did you go anywhere
     with Mr. Caudill ever again?

A    I went one more place after that.  We went to the
     auction that night with my grandma and my dad.

Q    Did you go anywhere by yourself with him ever
     again?

A    One place.  That was it.

Q    Okay.  Why, after this had happened, would you go
     somewhere by yourself with him?

A    I don't know.  I wasn't really thinking.

Q    Were you scared of him?

A    Yes.

Q    If you were scared, why would you put yourself

back in that same position?

A    I don't know.

Q    Did anything happen that night?

A    No, sir.

Q    How soon after April 17, 2001, was that?

A    About five months, about six months ago, I think.

Q    Six months ago?

A    Something like that.

Q    How, who did you tell first about this, other than Heather?

A    Well, I told my boyfriend at the time.

Q    When you told your boyfriend, was it before or after this last trip with Mr. Caudill?

A    It was, I think it was before.

Q    You told your boyfriend what had happened on April 17 and then you still went somewhere alone with him?

A    That was after everything happened.  My dad had gone to the auction and was leaving and we had gone to get something to eat and I wasn't really thinking.

Q    You say going right up the road to eat, about how far?

A    It was like a minute, maybe a minute to get there.

Q    Was this in Enterprise?

A       This was in Daleville.

Q       Okay.  Okay.  Is this where you were living - - -
        at the time you made this second trip, you were
        living in Daleville?  Is that right?  Is that what
        you are telling us?

A       Yes, sir.

Q       Okay.  About when did you tell your boyfriend when
        all this had happened?

A       It was about, it was like, this was like nine
        months ago, maybe.

Q       Would it be fair - - - okay.  When you told him,
        when did you first talk to the police?

A       It was that same night after I told my dad.  It
        was like the next morning after that.

Q       Okay.  So, that would be in June?

A       I think it was.

Q       Can you tell the Ladies and Gentlemen of the Jury
        why you didn't make this kind of report and say
        what he did to you for so long?

A       Because I was upset.  I was scared.  I didn't know
        what to do.

Q       Did you discuss it with your boyfriend?

A       Yes.

Q       Then why did you tell your dad?

A       Because he wanted me to.

Q    Who wanted you to?

A    My boyfriend at the time.

Q    When you were in that motel room, did you talk about him touching you?

A    Yes.

Q    Did you allow him to do that voluntarily?

A    I had no choice but to.

Q    What did you think was going to happen if you didn't let him?

A    That somebody would be dead in my family.

Q    Did you know what family member that would be?

A    I had no idea.

Q    Did you know whether it was your sister?

A    No.

Q    All right.

        MR. DAVIS:  No more questions.

        THE COURT:  Okay.  Thank you.  Cross, Mr. Blumenfeld?

        MR. BLUMENFELD:  Yes, Your Honor.  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. BLUMENFELD:

Q    Mrs. Mitchell, what is your date of birth?

A    8-21-84.

Q    So, you are eighteen?

A    Yes.  Now.

Q    So, do you remember giving a statement to the

police?

A    Yes.

Q    At the police department?

A    Yes.

Q    And, there was a female officer, I believe Officer

Duhaime is her name.  I may not have pronounced

that right.  Her name is Sheila?

A    Yes.

Q    And, do you remember giving that statement around

June 14, this year?

A    Yes.

Q    And, you told her on that date that you were

seventeen?

A    Yes.

Q    But, you were eighteen then, weren't you?

A    I was seventeen then, but now I am eighteen.

Q    Okay.  In June of 2002, you were seventeen?

A    Yes.

Q    Okay.  Rachel, your sister testified earlier and

she said that you and her had known Stanley for

about a year prior to this.  Is that correct?

A    We had known him about four years.

Q    And, is it also correct from six months to a year,

she couldn't remember, but between six months and

a year, every Tuesday you and she would go with

him to the auction?

A    Yeah.  I went a couple of times.

Q    So, she said y'all went every Tuesday for a year

and that would be incorrect?

A    That is right.

Q    That is incorrect?

A    That is right.

        THE COURT:  I am getting confused.  Excuse

me a moment.  What is right?  It is correct that

it was only a couple of times or it is correct

that every time for a year you went to the

auction?

        THE WITNESS:  We went a couple of times.

        THE COURT:  You only went a couple of

times?

        THE WITNESS:  Yes.

        THE COURT:  Okay.

BY MR. BLUMENFELD:

Q    Now, today you testified that he made you pull

over at a store in Bonifay.  Is that correct?

A    Yes.

Q    It was not a gas station?

A    It was a gas station and store together.

Q    I want to ask you again to think when you gave

your statement to Officer Duhaine; do you remember

that?

A    Yes.

Q    Do you remember telling her that you went through

Hartford and stopped on the side of the road?

A    Yes.

Q    Do you remember telling her that?

A    Yes, sir.

Q    Was it Hartford or Bonifay?

A    We stopped on the side of the road in Hartford,

too.  And, he started messing with the gun.

Q    In Hartford?

A    Yes.

Q    So, if Heather would testify that the first time a

threat occurred was at the gas station in Bonifay,

she would have been incorrect?

A    She is right.  But, we also stopped on the side of

the road in Hartford, too.

Q    But, if she never mentioned Hartford and said the

first time it happened was in back of a gas

station in Bonifay, she would be incorrect?

A    She is right.  That is where we stopped at.

Q    But, that was not the first time, was it, Mrs.

Mitchell, according to your testimony?

A       Yeah.  That was the second time.

Q       So, she said it was the first time and she would

be incorrect?  I am not trying to confuse you, but

are you confused?

A       He stopped one time in Hartford.

Q       But, if she said the first time - - -

        MR. BLUMENFELD:  Your Honor, I am not

trying to intimidate this young lady; you know me

better than that.  I am trying to represent my

client, judge.

        THE COURT:  I understand.

        MR. DAVIS:  I object, because I didn't ask

that question.  He is trying to confuse her over

something that was never asked of the witness in

the first place.

        THE COURT:  This is Cross Examination.

The objection is overruled.  He can ask the

question, but I am not sure she understands the

question.

        MR. BLUMENFELD:  Okay.  All right.

        THE COURT:  So, maybe if you rephrase

it - - -

        MR. BLUMENFELD:  All right.

BY MR. BLUMENFELD:

Q       Mrs. Mitchell, your sister, Mrs. Austin, testified

|   |   |
|---|---|
|   | earlier this morning. |
| A | Yes. |
| Q | And she testified that you and she and Stanley were driving from Enterprise to the auction in Florida.  Is that correct so far? |
| A | Correct. |
| Q | And, she said that you were driving and that you, he made you pull over in the back of a gas station in Bonifay. |
| A | Yes. |
| Q | And threatened your family? |
| A | Uh-huh.  (Affirmative response.) |
| Q | Through the mafia? |
| A | Yes. |
| Q | If you and Heather did not have sex with him? |
| A | Yes, sir. |
| Q | My point is she never mentioned Hartford.  She never mentioned pulling over in Hartford.  My question to you is your testimony now is the first time he threatened both of you was making you pull over in Hartford.  Is that your testimony? |
| A | I thought we stopped in Hartford. |
| Q | I am sorry, ma'am? |
| A | I thought we stopped in Hartford, but we stopped in Bonifay. |

| | |
|---|---|
| Q | So, if you told the officer in your statement that you stopped in Hartford, that was incorrect? |
| A | Yes, sir. |
| Q | Now, after the threat was made to you and Heather, who drove from Bonifay back to Dothan? |
| A | He did. |
| Q | So, if Heather testified that you drove back from Bonifay to Dothan, then she would be incorrect? |
| A | I drove, too. |
| Q | If Heather, Mrs. Mitchell, if Heather testified you drove from Bonifay to Dothan, she would be incorrect? |
| A | Yes. |
| Q | Mrs. Mitchell, you and someone drove to the motel? |
| A | He did. |
| Q | And you checked in or he checked in at the front of the motel? |
| A | Yes. |
| Q | Both you and Heather stayed in the truck? |
| A | Yes. |
| Q | How long did it take him to check in? |
| A | About five minutes. |
| Q | Okay. Did you look around to see where you and she were? |
| A | No. |

Q    You didn't see the shopping center right next to the motel?

A    No.

Q    You didn't see all the lights around the motel?

A    Yeah.

Q    And, you and she never ran?

A    No.  We had no way to.

Q    Pardon?

A    We couldn't.

Q    You didn't run into the motel?  There was a desk clerk there?  Correct?

A    Yeah.

Q    You did not tell that man or lady please help us?

A    No.

Q    After you and Heather and Stanley left the motel, you went to Ruby Tuesday?

A    Yes.

Q    Got something to eat?

A    Yes, sir.

Q    Something to drink?

A    Yes.

Q    I don't mean alcohol; you got something to eat and drink?

A    Yes.

Q    Then he took you home?

A    Yeah.

Q    And what did you and Heather do or what did you do

     after that night?  Go to bed or - - -

A    Went to bed and forgot about it.

Q    You went to bed and forgot about it?

A    (Witness nods her head to the affirmative.)

Q    Heather also testified - - - let me withdraw and

     ask this, Miss Mitchell.  When did you get

     married?

A    October 11, 2002.

Q    Between the time that this allegedly took place

     and the time that you were questioned by the

     police, who did you live with?

A    My dad.

Q    Did Heather also live there?

A    Yes.

Q    And, your brother, little brother and sister and

     your dad's girlfriend at the time?

A    And my dad's girlfriend at the time.

Q    I assume they are married?

A    No.

Q    Still not married?

A    Huh-uh.   (Negative response.)

Q    I didn't want to keep saying girlfriend if it was

     your step-mother.

A     No. She is not.

Q     And, Heather testified Stanley would come over to the house, she said ten or twelve times. Is that correct?

A     Yes.

Q     And, he never threatened you or her at that time?

A     No.

Q     You testified later you did go with him to an auction again?

A     To get something to eat. That is it, with my dad and grandma behind me.

Q     Wasn't it you and he by yourself?

A     They were following us.

Q     Okay. Did you ever go with him again, by yourself somewhere?

A     No.

Q     Again in your statement to the police officer here in Dothan, a question she asked:

       Y'all left the motel and went straight to Enterprise?

And, you answered:

       Yes.

Is that correct? Y'all didn't make any stops?

A     No, sir.

Q     So, that was incorrect, also? You did go to Ruby

Tuesdays, didn't you?

A      Yes.

Q      That was incorrect what you told the police
officers?

A      Yes.

Q      Now, in answer to Mr. Davis' question, I believe
you told him you told your boyfriend about nine
months ago that this happened?

A      Yes.

Q      All right.  Again, asking you to remember the
statement that you told the police officer:

            Well, my boyfriend made me tell my dad.  I
            think it was like two weeks ago.

So, now you told a police officer that this was
about two weeks from June that you told someone?
Correct?

A      Yes.

Q      That that is the, which is the correct statement;
what you told the police officer or what you told
today?

A      What are you talking about?

Q      Ma'am?

A      What are you talking about?

Q      My question is when is the first time you told
someone, obviously other than Heather, that this

had happened?

A     I told my boyfriend and the police.  Like - - - I told my boyfriend the night that I told my dad.

Q     When did you tell your boyfriend?

A     About two weeks or in June sometime.

Q     June of what year?

A     2002.

Q     This year?

A     Yes.

Q     That is the first time you told anyone?

A     Yeah.

Q     June of 2002?

A     Yes.

Q     The first time you told anyone about this?

A     Yes.

Q     What happened that night, Miss Mitchell, made you angry?

A     That he was going to kill one of my family members?

Q     No.  What he, you say he did to you that night, did it make you angry?

A     Yes.

Q     Did it make you upset?

A     Yes.

Q     Did it make you bitter and angry?

A    Yes.

Q    Until your statement two weeks ago, you never told anyone, but obviously Heather?

A    And my dad.

Q    When did you tell your father?

A    The night I told my boyfriend.

Q    The night you told your boyfriend?

A    Yes.

Q    Which was in June of 2002?

A    Yes.

Q    Up until then, you never spoke to a teacher?

A    No.

Q    Or other family members?

A    No.

Q    Any type of counselor?

A    No.

Q    Your pastor?

A    Huh-uh.  (Negative response.)

Q    You told no one?

A    I told no one.

        MR. BLUMENFELD:  Thank you, Your Honor.

        THE COURT:  Thank you.  It is almost 12:00 o'clock.  Do you have anything?

        MR. DAVIS:  I will be brief.

        THE COURT:  Very brief.

## REDIRECT EXAMINATION

BY MR. DAVIS:

Q     Mr. Blumenfeld asked you a series of questions
      about telling it, telling people.  Up until you
      told your boyfriend and father, the answer is no?
      Right?

A     I told them.  Yes.

Q     But, you didn't tell anybody else up until then?
      Right?

A     Yes.

Q     And, I believe earlier, after he took you home
      from Ruby Tuesday, you went home, went to bed and
      tried to forget about it, didn't you?

A     I did forget about it.

Q     Is this something that was a pleasant experience?

A     No.

Q     Something that is easy to sit up there and tell
      fourteen plus people about?

A     (No response.)

Q     Is it easy to tell us about it?

A     No.

Q     Mr. Blumenfeld asked you about your age now.  How
      old were you on April 17 of 2001?

A     Sixteen.

Q     How long had you been driving?

A      Maybe about a year.

Q      Were you familiar with all these roads Mr.

       Blumenfeld described around Hartford and Bonifay?

A      Not really.

              MR. DAVIS:  No more questions.

              THE COURT:  Thank you.  Anything else, Mr.

       Blumenfeld?

              MR. BLUMENFELD:  Yes, sir, Your Honor.

                    RECROSS EXAMINATION

BY MR. BLUMENFELD:

Q      The - - - your present husband, is that the same

       person as the boyfriend?

A      Yes.

Q      I believe you told the police, you said:

              What made you tell your boyfriend?

              I don't know.  That is the only person I

              could talk to because he was always there,

              you know.

A      Yes.

Q      Is that what you told them?

A      Yes.

Q      And you told the officer that it was about a month

       ago?  This was in June that you told your

       boyfriend?

A      Yes.

Q        So, if Heather - - - I withdraw that, Your Honor.

THE COURT:  Thank you.  Is that it?

MR. BLUMENFELD:  Yes, Your Honor.

THE COURT:  Anything else, Mr. Davis?

MR. DAVIS:  No, sir.

THE COURT:  Miss, you may step down.  Be careful as you leave your seat as there are a couple of steps there.

(Witness excused.)

THE COURT:  Ladies and Gentlemen, it is nearing the noon hour.  And, we are going to adjourn for lunch.  I have got to take a guilty plea on two cases at 1:00 o'clock.  Those were cases that were scheduled this morning and I did not want to keep y'all waiting.  So, I took one guilty plea and then there were the other two that remained.  I will do that at 1:00 o'clock.  So, there is no since in y'all waiting while I do that.  So why don't we reconvene, at least y'all reconvene then at 1:15.  And, you know, I may be ready then to bring you in or it may be a couple of minutes in finishing up those guilty pleas.

Just return to the Jury Deliberation Room at 1:15.  Remember not to discuss this case while you are away or allow anyone to discuss it with

you.

        With that, we will adjourn for lunch.
Thank you.

        (Thereupon, the Trial Jury proceeded to
        their lunch with the above instructions
        from the Court and the following
        proceedings were held, to-wit:)

        THE COURT:  Thank you all.

        (Thereupon, a recess was called and taken
        by all parties for lunch.  Upon completion
        of said recess, all parties returned to
        the Court Room and the following
        proceedings were held, to-wit:)

        THE COURT:  Everybody is back.  Okay.
Bring in the Jury.

        (Thereupon, the Trial Jury was returned to
        their places in the Jury Box and the
        following proceedings were held, to-wit:)

        THE COURT:  We are back in the hearing and
presence of the Jury.  All fourteen Jurors have
returned, the parties and respective attorneys are
present.

        Good afternoon, Ladies and Gentlemen.  I
trust y'all had a pleasant lunch.  Just prior to
the recess the State had placed before you two

witnesses and they are in the middle of this case
and I will call on Mr. Davis to call for his next
witness.

       MR. DAVIS:  Call Brian Harvin.  Mark that
while I go get him.

       (Thereupon, State's Exhibit Number 3 was
marked for identification by the Court
Reporter.  After that, the following
proceedings were held, to-wit:)

Thereupon,

BRIAN HARVIN

       was called as a witness on behalf of the
State of Alabama and after having been first duly
sworn, testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. DAVIS:

Q      State your name, please.

A      Brian Harvin.

Q      How are you employed?

A      I am an Investigator in the Criminal Investigation
Division of the Dothan Police Department.

Q      And, how long have you been in criminal
investigations?

A      Since February of 2000.

Q      How long have you been a Dothan Police Officer?

A       Since November of 1998.

Q       Prior to that, did you serve anywhere?

A       I worked for the Enterprise Police Department for
        approximately eight years.

Q       And, what divisions were you in over there?

A       Criminal Investigation Division for six years.

Q       Earlier this year, did you have an occasion to
        conduct an investigation regarding allegations of
        Rape and Sexual Abuse involving Stanley Caudill?

A       Yes, sir.

Q       Not what was said, but who did you speak with
        regarding your investigation?

A       I spoke with Rachel and Heather Austin and Mr.
        Caudill.

Q       And, after you discussed certain events and
        happenings with Rachel and Heather, did you
        attempt to confirm where the acts took place?

A       Yes, sir.

Q       Where was that?

A       Holiday Inn on the south side of Dothan.

Q       And, that particular Holiday Inn is located here
        in Houston County?

A       Yes, sir.

Q       At what point did you come in contact with Mr.
        Caudill?

A        I met him on June 12.

Q        When did you receive your initial complaint?

A        On June 4.

                MR. DAVIS:  Mark this.

                (Thereupon, State's Exhibit Number 4 was

                marked for identification by the Court

                Reporter.  After that, the following

                proceedings were held, to-wit:)

BY MR. DAVIS:

Q        Tell the Ladies and Gentlemen prior to meeting

         with Mr. Caudill, what things did you do as part

         of your investigation?

A        After speaking with Rachel and Heather, I

         attempted to confirm the location that this

         incident took place.  I went to the Holiday Inn on

         the south side of Dothan near 231 or South Oates

         Street and the Ross Clark Circle.

Q        When you went there, did you confirm that there

         had been a room in his name?

A        I did.

Q        And, was it also the same date that had been

         provided to you by the ladies?

A        Yes, sir.

Q        After you did that, what other things did you do

         prior to talking to him or is that essentially

talking to Heather and Rachel and confirming the location?

A    After speaking with Rachel and Heather, I set up another appointment for an interview with Rachel and Heather.

Q    Okay.

A    After that time I received the information from the Holiday Inn and that is when I talked to Mr. Caudill.

Q    Before you talked to him, did you also set up a controlled phone call to him?

A    I did.

Q    Let me show you what has already been marked and admitted as State's Exhibit Number 1.  And, do you recognize that to be the tape of that controlled phone call?  (Produces the exhibit in question for examination.)

A    (Witness studies the exhibit in question as requested.)  That is correct.

Q    When you met with Mr. Caudill, where did you meet him?

A    At the Police Department here in Dothan.

Q    And, did you call him to come there or how did that work out?

A    He had been arrested.

Q       Okay.  Had you, prior to talking to him, had you

        obtained a warrant based on all the information

        that you had?

A       That is correct.

Q       Once he was placed under arrest, where was he

        taken?

A       Taken to the Dothan City Jail.

Q       Okay.  Where did you actually have this

        conversation you refer to?

A       I spoke with Mr. Caudill in my office at the

        Criminal Investigation Division of the Dothan

        Police Department.

Q       If you would, tell the Ladies and Gentlemen of the

        Jury what State's Exhibit Number 4 is, the form I

        provided for you?  (Produces the exhibit in

        question for examination.)

A       (Witness studies the exhibit in question as

        requested.)  This is a Rights Waiver Form.

Q       And, tell them what that means.

A       Certain rights Mr. Caudill had before I speak with

        him.  I explained these rights to Mr. Caudill and

        made sure he understands them before I interview

        him.

Q       Okay.  Did you read the form to him?

A       Yes, sir.

Q        And, while you are reading it, does he have a copy
         as well?

A        I provided Mr. Caudill a form and read off the
         copy of the exact same form.

Q        If you would please, read to the Ladies and
         Gentlemen exactly as you read your Rights Form to
         Mr. Caudill.

A        (Witness reading from the exhibit in question as
         requested.)

              Before I ask you any questions, you must

              understand your rights.  You have the

              right to remain silent.  Anything you say

              can be used against you in Court.  You

              have the right to talk to a lawyer for

              advice before answering any questions and

              have him with you during questioning.  If

              you cannot afford a lawyer, one will be

              appointed for you, if you wish.  If you

              decide to answer questions now without a

              lawyer present, you still have the right

              to stop answering at any time.  You also

              have the right to stop answering at any

              time until you talk to a lawyer.  Waiver

              of these rights.  I have read the

              statement of my rights and understand what

my rights are. I am willing to make a
statement and answer questions. I do not
want a lawyer at this time. I understand
and know what I am doing. No promises or
threats have been made to me and no
pressure of any kind has been used against
me to get me to make a statement.

Q    At any time, did he express to you that he didn't
understand any of those rights?

A    No, sir.

Q    Did he tell you at any time that he wanted a
lawyer?

A    No, sir.

Q    After you read that waiver of rights paragraph,
how did you have him indicate to you that he
wanted to waive his rights?

A    I asked Mr. Caudill to sign the form.

Q    Did he do so in your presence?

A    Yes.

Q    Did he also put his education level on there?

A    I asked him before I read the rights to him what
his educational level was and I wrote that down on
the form myself.

Q    Okay. Prior to him signing that or giving you a
statement, did you promise him any reward or

inducement to get him to make a statement?

A     No, sir.

Q     Did anybody do that in your presence?

A     No, sir.

Q     Did you threaten him or coerce him or anybody else

in your presence threaten him or coerce him in

order to get him to make a statement?

A     No, sir.

Q     And, did you, in fact, take a statement from him?

A     Yes, sir.

Q     And, was it also on tape?

A     Yes, sir.

Q     If you would please, produce that tape.

A     (Witness does as requested.)

        MR. DAVIS:  Mark that.

        (Thereupon, State's Exhibit Number 5 was

        marked for identification by the Court

        Reporter.  After that, the following

        proceedings were held, to-wit:)

BY MR. DAVIS:

Q     The particular waiver, State's Exhibit 4, is it a

fair and accurate copy of your original that you

maintain in your file?

A     That is correct.

Q     Other than having an exhibit mark on it, is it any

different from the original?

A    No, sir.

        MR. DAVIS:  Move to admit State's Exhibit Number 4.

        THE COURT:  Any objections?

        MR. BLUMENFELD:  No, Your Honor.

        THE COURT:  State's Exhibit Number 4 is admitted without objection.

        (Thereupon, State's Exhibit Number 4 was received in evidence.  After that, the following proceedings were held, to-wit:)

BY MR. DAVIS:

Q    State's Exhibit Number 5, the tape up there, is it the same tape as when you took the statement from Mr. Caudill?

A    Yes, sir.

Q    Has it been altered or changed in any form or fashion since then?

A    No.

Q    Have you listened to it to determine whether it fairly and accurately represents that conversation?

A    I have.

Q    And, does it?

A    Yes, sir.

Q    And, State's Exhibit Number 3, that I have placed

before you, can you tell the Ladies and Gentlemen

what State's Exhibit Number 3 is?  (Produces the

exhibit in question for examination.)

A    (Witness studies the exhibit in question as

requested.)  This is a transcript of the tape

recording interview between myself and Mr.

Caudill.

Q    And, have you compared State's Exhibit Number 3

and State's Exhibit 5, the tape, to make sure that

the transcript is a fair and accurate depiction of

what is on the tape?

A    I have and it does.

MR. DAVIS:  At this time, we move to admit

State's Exhibit Numbers 3 and 5.

THE COURT:  Any objections?

MR. BLUMENFELD:  No, Your Honor.

THE COURT:  State's Exhibits 3 and 5 are

admitted.

(Thereupon, State's Exhibit Numbers 3 and

5 were received in evidence.  After that,

the following proceedings were held, to-

wit:)

MR. DAVIS:  With the Court's permission,

may I play State's Exhibit 5?

THE COURT:  Let me see Number 3.

MR. DAVIS:  (Produces the exhibit in question for examination as requested.)

THE COURT:  Ladies and Gentlemen, keep in mind my earlier instruction regarding a transcript.  As I indicated to you before, from time to time there are typographical errors and parts which are inaudible.  So, the taped statement, I want you to listen to that and if there is a conflict, of course, the taped statement would take precedence over anything that might appear on this typewritten transcription.

MR. DAVIS:  (Produces copies of State's Exhibit Number 3 to the Jurors.)  If you would, play Exhibit 5.

(Thereupon, State's Exhibit Number 5 was played in open Court.  During the playing of the said exhibit, the following proceedings were held, to-wit:)

THE COURT:  Stop the tape.

THE WITNESS:  (Does as requested.)

THE COURT:  I asked that he stop the tape just for want of clarification.  If you will note on the transcript, State's Exhibit Number 3, it says statement of Stanley Lee Caudill, C-A-R-D-I-

L-L.  Of course, it is my understanding that it is

Caudill, C-A-U-D-I-L-L.  That is what I am talking

about when there are errors.  You may continue.

       (Thereupon, the playing of State's Exhibit

       Number 5 was continued in open Court.

       Upon completion of the playing of the

       tape, the following proceedings were held,

       to-wit:)

       MR. DAVIS:  I have no further questions,

at this time.

       THE COURT:  Okay.  Thank you.  Cross, Mr.

Blumenfeld?

       MR. BLUMENFELD:  Just a few, Your Honor.

### CROSS EXAMINATION

BY MR. BLUMENFELD:

Q     Officer Harvin, in response to Mr. Davis'

questions about whether or not he voluntarily came

to your office or the police department, you

answered:

       He was arrested.

A     That is correct.

Q     So, you never called him and invited him to come

down?  You never gave him the option to

voluntarily come down as opposed to arresting him?

Is that correct?

A       That is correct.

Q       And, to reiterate the examination from Mr. Davis,

        did you read him his rights?

A       Yes, sir.

Q       You gave him every opportunity to ask for a lawyer

        if he wanted one?

A       That is correct.

Q       You gave him every opportunity not to speak to you

        if he did not want to?

A       Yes, sir.

Q       And, those rights and that information, obviously

        he was under arrest and still gave his statement?

A       That is correct.

                MR. BLUMENFELD:  That is all, Your Honor.

                THE COURT:  Anything else, Mr. Davis?

                MR. DAVIS:  No questions.

                THE COURT:  Officer, you may step down.

        Thank you for coming.  Be careful as you leave

        your seat.

                (Witness excused.)

                MR. DAVIS:  We rest.

                THE COURT:  The State rests.


                        STATE RESTS

THE COURT: Ladies and Gentlemen, the
State has rested. There is a matter that I need
to take up outside your presence. Remember on
Thursday that I told you there would be times like
these and this is one of those times. Return to
the Jury Deliberation Room and I will be with you
shortly. Remember not to discuss this case among
yourselves or allow anyone to discuss it with you.
I will be with you shortly.

    (Thereupon, the Trial Jury proceeded to
    the Jury Deliberation Room with the above
    instructions from the Court and the
    following proceedings were held, to-wit:)

THE COURT: We are out of the hearing and
presence of the Jury. Any motions?

MR. BLUMENFELD: Yes, sir, Your Honor. At
this time we move for a judgment of acquittal,
judge, based upon the fact that the State has not
proven that there was any forcible compulsion or
any action done by my client by either one of
these young ladies. This was some testimony about
he threatened their families, but there was never,
to my remembrance, any direct threats to either
one of the girls. There was only some vague
testimony about, some vague threat to family

members and didn't express what family members.
They both testified while in the motel room, there
was no threats, no force placed upon them for them
leaving or staying in the motel room.  And, we do
not think that the State has shown forcible
compulsion took place in this case.

THE COURT:  Thank you.  As you know at
this juncture, the evidence must be viewed in a
light most favorable to the State and the State
being afforded all inferences thereby.  There was
testimony from the two girls that there was a gun
present, that there was a gun taken into the room.
The statement by your client indicates there was a
gun, albeit, according to him, a B-B gun that was
on his person.  There were statements made by the
two girls that if these things didn't happen, then
family members would be harmed.  For all those
reasons, your motion is denied.

MR. BLUMENFELD:  Your Honor, I may be
jumping ahead of myself, but since the Jury is not
present, I will inform the Court that I would, as
far as Requested Charges, I don't have anything
but the, except whatever the Court is going to
charge the Jury.  I would, Your Honor, in the
Indictment alleging Rape of Heather Austin, I

would ask for a lesser included charge.  I think a charge on the lesser included offense of Sexual Abuse in the First Degree.

THE COURT:  Okay.  What says the State concerning the lesser included of Sexual Abuse, First Degree?

MR. DAVIS:  I would be opposed.  Number one, there is no evidence there was any Sexual Abuse in the First Degree.  It was either Rape or it wasn't.  I don't know if they will put on a defense or not; so far it is essentially denial.  At this point, I feel it is all or nothing.

THE COURT:  I disagree with that.  From his statement, he indicates that he rubbed on both girls, massaged, if you will.  I think on one he said he may have brushed the vagina.  I can't remember which girl, but nonetheless, he indicated on both girls he massaged them.  He denies any sex with either of the girls and indicates in his statement that he was impotent.  So, you know, Alabama Law says if there is any evidence, however slight, to support a lesser included offense, it should be given.

MR. DAVIS:  Yes, sir.

THE COURT:  Consequently I will give

Sexual Abuse, First Degree as a lesser included

offense of the Rape charge.

     MR. DAVIS:  Yes, sir.

     THE COURT:  Okay.  This is well, we are

kind of getting ahead of ourselves here.

You - - -

     MR. BLUMENFELD:  I wanted to make known,

so we don't have to keep the Jury coming in and

out.

     THE COURT:  What I was going to ask you is

this; do you intend to put on any evidence?

     MR. BLUMENFELD:  No, I do not.

     THE COURT:  You rest?

     MR. BLUMENFELD:  Yes, sir.  I am going to

rest.  I apologize, judge.  I didn't want the Jury

coming in and out like a yo-yo.  So, I am sorry.

     THE COURT:  Well, thank you.  I did not

know that you were resting.  So, you will not

place - - -

     MR. BLUMENFELD:  One second, Your Honor.

     THE COURT:  Okay.

(Thereupon, an off the Record discussion was held between the Defendant and his Attorney of Record, the Honorable Jack A. Blumenfeld. After that, the following proceedings were held, to-wit:)

MR. DAVIS: While they are talking, can I copy my one charge?

THE COURT: Yes.

MR. BLUMENFELD: We are going to rest, Your Honor.

MR. DAVIS: I will make a copy.

MR. BLUMENFELD: Can I take a short break?

THE COURT: Let me take care of this first and then we will.

(Thereupon, Mr. Davis left the Court Room and returned shortly thereafter and the following proceedings were held, to-wit:)

THE COURT: Okay. The State has submitted State's Jury Charge Number 1; the respective ages of the victim and the accursed?

MR. DAVIS: Accused. I didn't have an opportunity to proofread carefully. That should only be there one time.

THE COURT: Mr. Blumenfeld, what says the Defense concerning the State's Requested Charge?

MR. BLUMENFELD:  I ask the Court to direct
itself to 13A-6-60-A, the definition, under the
section of Sexual Offenses where it has forcible
compulsion.  I quote:  Physical force that
overcomes earnest resistance or threats, expressed
or implied, that places a person in fear of
immediate death or serious physical injury to
himself or another person.  I obviously don't have
that case.  I don't doubt for one millimeter of a
second - - - now, I have it.  I don't know if the
Court wants me to review, take the time to review
the case, but the Code Section indicates nothing
about moral, psychological or intellectual force.
It says nothing about ages or mental or physical
conditions of the victim.  It appears one of the
quotes is quoting a Pennsylvania Supreme Court
Case and it - - - judge, looking at the facts of
this case that Mr. Davis has given me, it appears
the victims, alleged victims were eleven or twelve
years old.  Certainly that is not the case in this
particular case.  The ages in this particular
case - - - judge, apparently looking at the facts
of this case - - - I will give it to the Court.
It appears initially when the alleged facts in
this case began, the victims were much younger.

The alleged victim in this case, Your Honor, and also the period of time in which the acts were perpetrated against the victim was for a considerable length of time.  Judge, I do believe the definition in the Code to charge the Jury is sufficient.

THE COURT:  (Studies the case cite.) Okay.  This is a particularly difficult issue in that the State's Jury Charge Number 1 talks about forcible compulsion, including moral, psychological or intellectual force used to compel a person engage in a sexual act against that person's will and then talks about the factors to be weighed in that determination.  The only problem I have with it, and I can understand why you would want that charge, but that is North Carolina Law.  No where in this case does it say that we agree with the North Carolina decision.

MR. DAVIS:  What they based the decision on was Ex Parte Poe, Willie James Poe.  Poe, toward the end, also includes the very same factors.

THE COURT:  Show me Poe.

MR. DAVIS:  I don't have it with me.  They rely on it.

THE COURT:  Do you disagree that the language in State's Jury Charge Number 1 is taken out of a Pennsylvania Supreme Court Case and quoted verbatim and that the Alabama Supreme Court did not, did not adopt that language in its decision?

MR. DAVIS:  Not specifically.  But, what, that is what they based their decision.

THE COURT:  If you can show me Alabama Law that indicates that that is the definition of forcible compulsion, otherwise I am going to stick with the definition of forcible compulsion as it is set out in the Pattern Jury Charges.  I know if that definition is given, I can't go wrong.  If I give something from a North Carolina Supreme Court Case, I can go wrong.  I need the entire case.

MR. DAVIS:  Yes, sir.  I am looking for the cite for Poe.

THE COURT:  Do you have any other Reporter, 597 - - - I don't start until 615.  That is all I have.

MR. DAVIS:  Can I see if there is? Limited to this building, if I can find it within the building?

THE COURT:  Take five minutes.

MR. DAVIS:  Yes, sir.

(Thereupon, a recess was called and taken

by all parties.  Upon completion of said

recess, all parties returned to the Court

Room and the following proceedings were

held, to-wit:)

THE COURT:  We are still out of the

presence and hearing of the Jury.  Do you have

anything, Mr. Davis?

MR. DAVIS:  No, sir.

THE COURT:  I understand your Requested

Charge and I tend to agree with you.  There ought

to be some language in the Pattern Jury Charges

that expand forcible compulsion to include some of

the situations.  And I agree that Alabama has

commented about the ages of the parties and that

sort of thing.  But, I have got the Pattern

Charges and then I have got the case that you gave

me and the language you have used from Ex Parte

Howell and you say Ex Parte Howell and give a cite

and indicate quoting another source.  That other

source is a North Carolina Supreme Court Case and

I really don't want to get into giving Jury

Charges out of North Carolina.  I think I could

possibly be reversed if I steer too far away from

the Pattern Jury Charge.

So, for those reasons, I am going to deny State's Requested Charge Number 1.

MR. DAVIS:  Yes, sir.

THE COURT:  How much time do y'all need to argue your respective cases?

MR. DAVIS:  Fifteen minutes.

MR. BLUMENFELD:  Judge, you know, I am pretty brief.  As long as the Court will give me, I don't mean to be flippant or sarcastic.  I am open-ended.  Whatever the Court feels.  I would like as much time, perhaps at least fifteen.

THE COURT:  Okay.  Fifteen then.  If you will please, ma'am, bring in the Jury.

I do wish though, Mr. Davis, the State would perhaps amend a Pattern Charge to make it a little more explanatory because as it stands, forcible compulsion is the physical force that overcomes earnest resistance or is a threat expressed or implied that places a person in fear or death or serious physical injury to himself or another person.

MR. DAVIS:  I will bring Poe next time.

THE COURT:  Okay.

(Thereupon, the Trial Jury was returned to their places in the Jury Box and the following proceedings were held, to-wit:)

THE COURT:  We are back in the hearing and presence of the Jury.  All fourteen Jurors have returned, the parties and respective attorneys are present.

Ladies and Gentlemen, as I told you, there are times when the Court must take up matters outside your presence and we have tried to kill two birds with one stone.  While you were away, the State rested.  That is you have heard all the evidence that you are going to hear from the State.  Now, I will turn to the Defense.  Mr. Blumenfeld.

MR. BLUMENFELD:  The Defense rest, Your Honor.

THE COURT:  The Defense rest.


DEFENDANT RESTS


TESTIMONY CONCLUDED


THE COURT:  And, I knew that while you were back there, but I wanted to place it on the

Record and I wanted you to know that both sides
have rested now in this case.  The only thing that
remains is for the attorneys to argue their
respective cases to you.  As I indicated to you
Thursday, the State goes first and will be
followed by the Defendant and the State gets a
last opportunity to address you because the State
has the burden of proof, which is beyond a
reasonable doubt.  After all of that, I will
charge you with the law that is applicable in
these two cases, release the two alternates and
then submit the case to you for your
deliberations.

          Now, each side has not longer than fifteen
minutes to argue their respective cases to you.
The State will divide it's time up however it
chooses, but will not get longer than fifteen
minutes.  Having said that, Mr. Davis, you may
argue your case to the Jury.

          MR. DAVIS:  Thank you, Your Honor.

          THE COURT:  By the way, it is 2:32.

          MR. DAVIS:  May it please the Court, Mr.
Blumenfeld:  (States the State's Closing Argument
to the Jury.)

          THE COURT:  Thank you, Mr. Davis.  Mr.

Blumenfeld, you may argue your Closing Argument to the Jury. It is 2:43 by the clock on the wall. You have fifteen minutes.

MR. BLUMENFELD: Thank you, Your Honor, Mr. Davis, Ladies and Gentlemen: (States the Defendant's Closing Argument to the Jury.) How much time do I have left, Your Honor?

THE COURT: About a minute and a half.

MR. BLUMENFELD: (Concludes his Closing Argument to the Jury.)

THE COURT: Thank you, Mr. Blumenfeld. Mr. Davis, you may make your Final Closing Argument. You have not longer than four minutes. It is 2:58 by the clock on the wall.

MR. DAVIS: (States the State's Final Closing Argument to the Jury.)

THE COURT: One minutes.

MR. DAVIS: (Concludes the State's Final Closing Argument to the Jury.)

THE COURT: Thank you, Mr. Davis.

Now, Ladies and Gentlemen of the Jury, it is now my duty to charge you with the law that is applicable in these two cases. Before I move on to do that, I think I would be remiss in my duties if I did not commend the attorneys. They have

both done admirable jobs in representing their

respective clients.

I have been in this system now for twenty

years.  I have sat where Mr. Davis sits as an

Assistant District Attorney.  I have sat where Mr.

Blumenfeld sits as a Defense Attorney.  And, of

course, I have been a City Attorney for Dothan and

a judge now for seven years.  The more I am in the

system, the more I appreciate how it works.  But,

it only works everyone does their duty.

These attorneys have done theirs.

Everybody knows a lawyer joke or everybody likes

to poke fun at lawyers.  But, I am here to tell

you that the system would not work without them

and they have a job to do.  These two attorneys

have done that job admirably.  In a moment, I will

move on and do my duty and charge you with the law

that is applicable in these two cases.  After that

time, I will turn it over to you and you will do

your duty in these two cases.  You see, we all

have a role in deciding these cases.  The Jury,

you are the fact finders in this case.  You

determine what the facts are.

I spoke with you on Thursday and I hoped

at that time that I had made an impression as to

COURT OF CRIMINAL APPEALS NO. *CR-02-0755*

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC-02-1141 and 1142  Volume II___

CIRCUIT JUDGE ___Larry Anderson___

Type of Conviction / Order Appealed From: ___Rape I and Sexual Abuse I___

Sentence Imposed: ___10 years in each case consecutive, $1,000.00 Fine, $500.00___
___V. C. in each case___

Defendant Indigent: [X] YES [ ] NO

___Stanley Lee Caudill___

NAME OF APPELLANT

___Shaun McGhee   MCG 062___   ___702-1744___
(Appellant's Attorney)                        (Telephone No.)
___188 N. Foster Suite 101___
(Address)
___Dothan,___        ___Alabama___        ___36303___
(City)                    (State)                    (Zip Code)

### V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

*A*

you being an integral part of that or of this
system. And, I think now you are beginning to
realize how important and how integral that part
is. So, I did want to say that to you before I
moved on.

Now, let me do my duty and charge you with
the law that is applicable in these two cases. Do
you remember Thursday when I read the Indictment
to you? At that time, I told you that I was
reading the Indictment to you because I needed to
ask you a couple of questions concerning the
Indictment and for no other reason. I want to
read the Indictment to you again; this time for a
different reason. Because, you see, the
Indictment contains the elements of the offenses
charged here. The offense of Rape in the First
Degree and the offense of Sexual Abuse in the
First Degree; they are two separate cases. Every
offense made a crime by the laws of this State is
comprised of elements. And, it is the State's
duty to prove to you beyond a reasonable doubt
each and every one of the elements. These
Indictments contain those elements and I will read
them to you again for that reason.

In the first case, CC02-1141, the

Indictment reads as follows: (Reads the

Indictment to the Jury.) This Indictment charges

the Defendant with Rape in the First Degree. The

second Indictment returned by the same Grand Jury,

CC02-1143 reads as follows: (Reads the Indictment

to the Jury.) This Indictment charges the

Defendant with Sexual Abuse in the First Degree.

Now, as I told you, those two Indictments

basically set out the elements of Rape in the

First Degree and Sexual Abuse in the First Degree.

But, during my Oral Charge to you, I will go over

those elements one at a time and define any terms

that are applicable to those Indictments.

Now, one Indictment, the first one

charging Rape in the First Degree, has what is

known in the law as a lesser included offense. It

is not written out in the Indictment, but it is an

integral part of the Indictment nonetheless. As I

said, the first Indictment, CC02-1141 charges the

Defendant with Rape in the First Degree but does

have a lesser included offense. That lesser

included offense being Sexual Abuse in the First

Degree and I will, as I said, go over that with

you.

Now, the Indictment in these cases, of

course, are not any evidence in the cases and the
fact that the Defendant has been charged with
these offenses by Indictments and the fact that I
have read these Indictments to you is not to be
considered by you as any evidence against the
Defendant or any circumstance against the
Defendant. As I told you on Thursday, the
Indictments are really just the formal means or
methods by which charges are brought against the
Defendant and he is placed on trial before you.

Now, as to those two Indictments, the
Defendant has entered pleas of not guilty. He
says that he is not guilty of any offense
contained within those Indictments.

Now, Ladies and Gentlemen, there have been
terms used here today and Thursday, terms that are
words of art that carry with them their own
special definitions. And, I want to take a moment
and go over those with you. Terms like burden of
proof, which we talked about. Terms like beyond a
reasonable doubt and terms like presumption of
innocence. First, let me address the presumption
of innocence. The Defendant is presumed to be
innocent until he is proven guilty beyond a
reasonable doubt by the evidence in these cases.

He comes into Court cloaked with this presumption and this presumption follows him throughout the course and proceedings of the trial until the evidence produced by the State convinces each of you beyond a reasonable doubt as to his guilt. The presumption of innocence is to be regarded by you, the Jury, as a matter of evidence to the benefit of which the accused is entitled.

In the Defendant's case, as in all other cases where a Defendant pleads not guilty, the burden of proof is upon the State to convince each member of the Jury beyond a reasonable doubt as to the truth of the material allegations contained in the Indictment. So, when we talk about that term, burden of proof, that burden of proof is beyond a reasonable doubt.

Now, what does beyond a reasonable doubt mean? The doubt which would justify an acquittal must be a doubt for which you have a reason arising from the evidence, from any part thereof or any lack of evidence and remaining after a careful consideration of the testimony such as reasonable, fair-minded and conscientious men and women would entertain under all the circumstances. The State is not required to prove guilt beyond

all doubt, but beyond a reasonable doubt.  If
conflicting inferences may be drawn from the same
facts, the Jury should draw an inference
consistent with innocence.

Now, Ladies and Gentlemen, on Thursday
when you were impaneled for these cases, I took a
moment and discussed with you your duties as
Jurors or your role and responsibility as fact
finders in this case.  I want to take a moment and
repeat that.  Forgive me for being repetitious,
but some of it does bear repeating and is
important.  You should base your decision on the
evidence admitted in this Court Room.  Not
everything you heard and saw in this Court Room is
evidence.  Of course, the testimony, writings,
objects, other things presented during a trial are
evidence.  As I told you before, however, the
statements made by the attorneys are not evidence
and should not be used by you as evidence.  Once
evidence is admitted, only the Jury can decide two
essential things about the evidence.  First,
whether it should be believed.  And second, how
important is it.  You make these two decisions
about each part of the evidence by using your own
commonsense as reasonable men and women.  You

should not imagine things that cannot be proven by the evidence admitted at trial.

Of course, you must consider all the evidence admitted in this trial without bias, prejudice or sympathy to either side. You must be equally just to both sides. Your verdict must not be based on suspicion, speculation or conjecture. You are the sole judges of the evidence and the credibility of the witnesses. You may accept or reject any part of the testimony that you consider worthy or unworthy of belief.

In determining the weight to be accorded the testimony of any witness, you may consider the demeanor of the witness while on the witness stand, his or her apparent candor or evasion or the existence or non-existence of any bias or interest. As I said before, you may take in consideration any matter which you would in your own everyday affairs in passing upon the truthfulness and accuracy of the testimony in this case. Weigh the testimony in the light of your own common observation and experience and reach a verdict based upon the truth, as you determine it, from all the evidence.

Now, of course, Ladies and Gentlemen, it

would be your duty as Jurors to follow the law as
stated to you by the Court.

Now, Ladies and Gentlemen, in Alabama,
there are two types of evidence; there is direct
evidence which is sometimes referred to as
eyewitness evidence and then there is
circumstantial evidence.  The guilt of a defendant
may be proven by circumstantial evidence as well
as by direct evidence or by a combination of both
types of evidence.  Now circumstantial evidence
means it is not any direct, positive, eyewitness
evidence of any person who saw the commission of a
crime.  But, it is the events, the happenings, the
circumstances surrounding it.  Where the State
relies on circumstantial evidence either in whole
or in part to convict a party charged with the
commission of a crime, the degree of proof must be
the same; that is beyond a reasonable doubt.  That
does not mean, however, that because testimony is
circumstantial that you should disregard it and
not consider it because it is circumstantial.  It
means this, though; it means you must be satisfied
beyond a reasonable doubt as to the guilt of the
party on trial regardless of what kind of evidence
is relied on by the State to establish the guilt

of the Defendant.

Now, Ladies and Gentlemen, I told you that during the Court's Oral Charge, I would go over the elements of Rape in the First Degree and Sexual Abuse in the First Degree. Let me move on to that presently. Ladies and Gentlemen, the Defendant is charged in one Indictment with Rape in the First Degree. Now, a male commits the crime of Rape in the First Degree if he engages in sexual intercourse with a female and he does so by forcible compulsion.

Now, to convict, the State must prove beyond a reasonable doubt each of the following elements of Rape in the First Degree. Number 1, that the Defendant, Stanley Caudill, a male, engaged in sexual intercourse with Heather Michelle Austin, a female. And, I am going to define some of those terms. Number 2, that the Defendant did so by forcible compulsion. And, number 3, that the Defendant acted knowingly, as I will define that term. And, number 4, that it occurred in Houston County, Alabama. Those are the four elements and they are in the conjunctive; that is the State must prove each of those four elements.

Now, we talked about sexual intercourse and sexual intercourse has its ordinary meaning and occurs upon any penetration, however slight. Emission is not required. Forcible compulsion means this; forcible compulsion is physical force that overcomes earnest resistance or it is a threat, expressed or implied, that places a person in fear of death or serious physical injury to herself of to another person.

Now, Ladies and Gentlemen, if you find from the evidence - - - wait, before we do that, let me, I did mention knowingly and the definition of knowingly is this; a person acts knowingly with respect to  conduct or to a circumstance when he is aware that his or her conduct is of that nature or that the circumstance exist.

Now, if you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of Rape in the First Degree as charged, then you shall find the Defendant guilty of Rape in the First Degree.  If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of Rape in the First Degree, then you cannot find the Defendant guilty of Rape in

the First Degree.

Now, Ladies and Gentlemen, the second Indictment charges the Defendant with Sexual Abuse in the First Degree.  Let me give you the elements of Sexual Abuse in the First Degree.  A person commits the crime of Sexual Abuse in the First Degree if he subjects another person to sexual contact and he does so by forcible compulsion.  And, I will define the term sexual contact and I will also state the definition of forcible compulsion again.  To convict, the State must prove beyond a reasonable doubt each of the following elements of Sexual Abuse in the First Degree.  Number 1, that the Defendant, Stanley Caudill, subjected Rachel Ann Taylor to sexual contact.  And, number 2, that the Defendant did so by forcible compulsion.  And, number 3, that the Defendant acted knowingly.  And, number 4, that it occurred in Houston County, Alabama.

Now, Ladies and Gentlemen, sexual contact, as that term is used in these elements, is defined as sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desires of either party.  Again, I gave you this definition, but I

will repeat it as it is applicable under this statute. Forcible compulsion is physical force that overcomes earnest resistance or it is a threat, expressed or implied, that places a person in fear of death or serious physical injury to herself or to another person. If you find from - - - let me back up again. Knowingly, as I said, is with respect to conduct or a circumstance when he is aware that his or her conduct is of that nature or that the circumstance exists.

If you find from the evidence that the State proved beyond a reasonable doubt each of the above elements of Sexual Abuse in the First Degree as charged, then you shall find the Defendant guilty of Sexual Abuse in the First Degree. However, if you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of Sexual Abuse in the First Degree, then you cannot find the Defendant guilty of Sexual Abuse in the First Degree.

Now, Ladies and Gentlemen, those are the elements of Rape in the First Degree and Sexual Abuse in the First Degree.

Now, remember I told you that the first Indictment, the one charging Rape in the First

Degree, there is a lesser included offense and
that is Sexual Abuse in the First Degree. Now,
that is different from this Indictment, but the
elements are the same. So, this Indictment, the
one charging Rape in the First Degree, has a
lesser included offense of Sexual Abuse in the
First Degree. It is not written out in the
Indictment, but it is an integral part of the
Indictment nonetheless. The question might occur
to you well, how do we go about this process when
there is a lesser included offense that is not
written out in the Indictment. Well, the law says
this; it says you must first consider that charge
which is set out in the Indictment, that is Rape
in the First Degree. If you find, based on the
evidence that the State has proved beyond a
reasonable doubt that the Defendant was guilty of
Rape in the First Degree, then you would go no
further. However, if you find that the Defendant
is not guilty of Rape in the First Degree or that
the State failed to prove one or more of the
elements of Rape in the First Degree, then you go
on to consider the lesser included offense, Sexual
Abuse in the First Degree.

        Now, if you find, based on the evidence,

that the State has proved beyond a reasonable
doubt all the elements of Sexual Abuse in the
First Degree, then you shall find the Defendant
guilty of Sexual Abuse in the First Degree, the
lesser included offense in this Indictment.
However, if you find that the State failed to
prove beyond a reasonable doubt any one or more of
the elements of Sexual Abuse in the First Degree,
then you shall move on and find the Defendant not
guilty. Now, that is the process that you use in
considering a lesser included offense. And, we
are talking about this one Indictment, the first
Indictment charging Rape in the First Degree.

Now, in the second Indictment, the one
charging Sexual Abuse in the First Degree, there
is no lesser included offense. It is either
guilty of Sexual Abuse in the First Degree or not
guilty.

Now, Ladies and Gentlemen, I believe I
told you this before, but a judge is not permitted
by law to express his opinion or comment on the
affect of the evidence presented to you or on the
credibility of any of the witnesses in these
cases. Therefore, any ruling, statement or
expression which may have been made by me during

the course of this trial is not to be considered

by you as any effort on my part to convey to you

any feeling or opinion about the facts in these

cases or the credibility of any of the witnesses.

Now, Ladies and Gentlemen, the Defendant

did not testify in his own behalf in this case or

these cases.  That must not and you cannot take

that in consideration either for or against the

Defendant.  The Defendant has the right to either

testify in his own behalf or not to testify in his

own behalf.  And, the fact that he does stay off

the witness stand and does not testify cannot be

taken and considered by the Jury when it goes out

to weigh and consider all the testimony in these

cases and make up it's verdict as to the guilt or

innocence of the Defendant.

Now, Ladies and Gentlemen, I touched on

this briefly, as well; but, my office has prepared

for you verdict forms in these two cases.  I want

to take a moment and go over those verdict forms

with you.  In the first case, CC02-1141 - - - let

me also say this.  In all these verdict forms, the

three I am going over with you in the first case

and the two in the second case, the style is

basically the same.  When I talk about style, I am

talking about this bold, capital language that
appears at the top.  The only difference would be
the case number in these two cases.  So, that is
how you can keep up with these verdict forms.
But, the style, as I said, is basically the same.

In the first case, the one charging Rape
in the First Degree, it reads:  In the Circuit
Court of Houston County, Alabama, the State of
Alabama, Plaintiff, Versus Stanley Lee Caudill,
Defendant, Case Number CC02-1141.  I am going to
read the verdict forms to you.  There are three
possibilities, as I said, in this particular case.
Do not place any significance on the order in
which these are read, because none is intended by
the Court.  We the Jury, find the Defendant,
Stanley Lee Caudill, guilty of Rape in the First
Degree as charged in the Indictment.  If that is
the verdict of the Jury or corresponds with the
Jury's verdict, then your foreperson shall sign
and date that form.  However, if the Jury is not
convinced beyond a reasonable doubt that the
Defendant is guilty of Rape in the First Degree,
we go on, remember, and consider the lesser
included offense and that brings me to this form
and it reads as follows:  We the Jury, find the

Defendant, Stanley Lee Caudill, guilty of Sexual Abuse in the First Degree, the lesser included offense. If this is the verdict of the Jury or corresponds with the Jury's verdict, then your foreperson shall sign and date this form. However, if the Jury is not convinced beyond a reasonable doubt that the Defendant is guilty of the lesser included offense of Sexual Abuse in the First Degree, that brings us to the third form and it reads as follows: We the Jury, find the Defendant, Stanley Lee Caudill, not guilty. If the is the verdict of the Jury or corresponds with the Jury's verdict, then your foreperson shall sign and date this form. Those are the only three possibilities in that case.

Now, the second case charges Sexual Abuse in the First Degree. And, as I said, there are two possibilities in that case. Again, don't place any significance on the order in which these are read, because none is intended. But, the first possibility reads as follows: We the Jury, find the Defendant, Stanley Lee Caudill, guilty of Sexual Abuse in the First Degree as charged in the Indictment. If this is the verdict of the Jury or corresponds with the Jury's verdict, your

foreperson shall sign and date that form.

However, if the Jury is not convinced beyond a reasonable doubt that the Defendant is guilty of Sexual Abuse in the First Degree as charged in the second Indictment, then that brings us to the second possibility. It reads as follows: We Jury, find the Defendant, Stanley Lee Caudill, not guilty. If this is the verdict of the Jury or corresponds with the Jury's verdict, then your foreperson shall sign and date this form. Those are the only two possibilities in that case.

Now, Ladies and Gentlemen, when you go the Jury Room to begin your discussions about these cases, you will take with you any material presented as evidence. And, there were some exhibits that will go back with you. You will take the verdict forms which I have gone over with you just moments ago and you will take any notes that you may have taken during the course of this trial. Did any of you take any notes? If you did, raise your hand.

A JUROR: (Raises his hand.)

THE COURT: You did, sir? The reason I asked and I don't mean to single you out, but I must say this. In cases, sometimes it can be

beneficial for Jurors to take notes, particularly
when you are talking about numbers and figures and
that sort of thing.  But, when a Juror takes
notes, it must be stressed those are the notes of
that individual Juror and should not be shared
with the Jurors.  You might ask yourself why.  The
reason being is this:  There are or will be twelve
of you.  That is twenty-four eyes, twenty-four
ears and when a person takes notes, that is his or
her reflection on the testimony.  That is what he
or she remembers the testimony to be.  So
therefore, they cannot be shared with the other
Jurors.

Now, once you enter the Jury Room to begin
your discussions about this case, you should first
choose a foreperson who may be either a man or a
woman.  The foreperson's duties are these; first,
to keep order and make sure that everyone who
wants to has an opportunity to speak.  Second, to
represent the Jury in any communication you may
wish to make with the Court and the Court alone.
And third, to sign and present your verdict.
However, the foreperson does not have any more
power than any other Juror.  Your verdict must be
unanimous.  All Jurors are equal and all of you

would have to agree before you can reach any verdict in this case. Each Juror's verdict must be his or her own and should not be made out of a need to agree with everyone else. Yet, in order to bring twelve minds to the same decision, Jurors have to respect and listen to one others opinions honestly. You do not have to give up a conscientious conclusion which might be different from your fellow Jurors, but it is your duty to discuss it with your fellow Jurors carefully and honestly. It is your duty to be absolutely just to both sides in this case.

Now, in summary then, you should remember these two rules when you disagree with other Jurors. First, respect and consider the opinions of other Jurors. But secondly, in the end, reach your own conclusion. As I said, all twelve of you would have to agree before you reach and verdict in this case. Before you go to the Jury Room to begin your discussions about this case, I will give you the verdict forms and when you have reached a verdict, your foreperson will sign and date the verdict forms which correctly correspond with the verdict of the Jury. And, of course, the verdicts will be the verdict of all twelve of you.

Gentlemen, approach.

(Thereupon, the Attorneys of Record and the Court Reporter approached the Bench as instructed and the following proceedings were held out of the hearing of the Trial Jury, to-wit:)

THE COURT: Any exceptions to the Court's Oral Charge from the State?

MR. DAVIS: No, sir.

THE COURT: From the Defense?

MR. BLUMENFELD: Under 13A-6-60, subsection 8, judge, that defines forcible compulsion. In your charge, you did not include immediate death or serious injury. That is the definition in the Code on forcible compulsion. I don't believe you said immediate in your charge, judge.

THE COURT: Okay. You have your exception on the Record.

(Thereupon, the above named individuals returned to their places in the Court Room and the following proceedings were held in the presence and hearing of the Trial Jury, to-wit:)

THE COURT: Ladies and Gentlemen, it is my

practice to keep alternates in any jury trial,

whether it is criminal or civil. I think I told

you my reasons for that; if one of you became ill

or a family emergency took one of you away from

us, then the alternate would stand in the place of

the missing Juror. I usually keep one alternate,

but whenever I strike a Jury on Thursday for a

case to be tried Monday, a lot of things can

happen between then and now. So, I generally keep

two alternates in that situation. As it turned

out, we didn't need those alternates. But, they

have served, nonetheless and I want to call the

names of the two alternates. As I call your name,

please stand. Tommy Ray Allen; Alley, excuse me.

And, Katherine Johns Buchanan.

　　　　(Jurors stand as requested.)

　　　　THE COURT:  Y'all were the alternates in

this case or these cases. You may or may not have

wanted to go back and deliberate this case, but,

of course, the law says you cannot. I want you to

know that you have served, nonetheless and been

very patient and sat through this trial and

listened to this Court's lengthy Oral Charge. But

as I said, only twelve can decide the case and you

were the alternates in these cases. I guess the

only thing I can tell you right now is return in the morning at 9:00 o'clock. We will do it all over again. But, with that, you are free to go until in the morning at 9:00 o'clock. Thank you so much, again, for your service.

(Thereupon, the above named Alternate Jurors were discharged from their services and the following proceedings were held, to-wit:)

THE COURT: Now, Ladies and Gentlemen, the twelve of you may retire and make up your verdict in these cases.

(Thereupon , the Trial Jury proceeded to the Jury Deliberation Room with the above instructions from the Court and the following proceedings were held out of the hearing and presence of the Trial Jury, to-wit:)

THE COURT: Any exceptions to the Court's Oral Charge or anything else y'all want to place on the Record? Mr. Davis.

MR. DAVIS: No, sir.

THE COURT: Mr. Blumenfeld?

MR. BLUMENFELD: Yes, judge. I would ask, the exception is that you, when you charged the

Jury, you did not include immediate in regard to
serious - - - just a second, Your Honor.

THE COURT:  Sir?

MR. BLUMENFELD:  Judge, in your definition
of forcible compulsion, you stated it places a
person in fear or death or serious physical injury
to himself or another person.  Judge, in 13A-6-60,
subsection 8, it defines forcible compulsion as,
places a person in fear of immediate death or
serious physical injury to himself or another
person.

THE COURT:  Okay.  And, you are correct.
I don't recall using the term immediate, but there
are two reasons I did not do that.  One reason, of
course, is the Pattern Charges, both in Sexual
Abuse in the First Degree, do not mention
immediate or immediacy.  And secondly, there was
evidence in this case regarding a threat, either
direct or implied, talking about a family member.
And that, in a sense, could not be immediate,
because you are talking about some family member
that was not present at the time.  So, in a sense,
based on the evidence, there was no threat that a
person would immediately be killed.  So, I
understand your exception and you have it noted on

the Record.  But, no, I did not give it and I
have given you the reasons why.

MR. BLUMENFELD:  Thank you.  That is all
the exceptions I have, Your Honor.

THE COURT:  Anything else, gentlemen?

MR. DAVIS:  No, sir.

THE COURT:  We are adjourned.  It is 3:35
and we will return when the Jury has reached a
verdict.

(Thereupon, a recess was called and taken
by all parties.  After a period of time of
deliberations, the Trial Jury notified the
Court that they had reached their verdict
and all parties were returned to the
presence and hearing of the Court Room and
the following proceedings were held, to-
wit:)

THE COURT:  Gentlemen, we have a verdict.
Are you ready?

MR. DAVIS:  Yes, sir.

MR. BLUMENFELD:  Yes, sir.

THE COURT:  All right.  Bring in the Jury,
please.

(Thereupon, the Trial Jury was returned to their places in the Jury Box and the following proceedings were held, to-wit:)

THE COURT:  Back in the hearing and presence of the Jury.  All twelve Jurors have returned, the parties and respective attorneys are present.

Ladies and Gentlemen of the Jury, I understand y'all have reached a verdict in these two cases.  Is that correct?

A JUROR:  Yes.

THE COURT:  Okay.  I guess I have a question of you first; that is who is your Foreperson?

A JUROR:  (Raises their hand.)

THE COURT:  For the Record, your name?

A JUROR:  Glenn Dickerson.

THE COURT:  Mr. Dickerson, have you signed and dated the verdict form that correctly corresponds with the verdict of the Jury?

A JUROR:  Yes, sir.  I have.

THE COURT:  Will you hand them to the deputy please, sir.

A JUROR:  (Does as requested.)

THE COURT:  Okay.  Mr. Dickerson, I know

it is obvious to everyone in here, but for the

benefit of this silent Record, have you handed

those verdict forms to the deputy who has now

handed them to me?

A JUROR:  Yes, sir.  I have.

THE COURT:  I will now read the verdict of

the Jury.  The Defendant shall stand.

(Thereupon, the Defendant, Stanley Lee

Caudill, and his Attorney of Record, the

Honorable Jack A. Blumenfeld, stand at the

counsel table as instructed and the

following proceedings were held, to-wit:)

THE COURT:  In the first case, CC02-1141;

in the Circuit Court of Houston County, Alabama,

State of Alabama, Plaintiff Versus Stanley Lee

Caudill, Defendant, the verdict of the Jury reads

as follows:  We the Jury, find the Defendant,

Stanley Lee Caudill, guilty of Sexual Abuse, First

Degree, the lesser included offense.  It is signed

by the Foreperson, Mr. Dickerson and dated this

the 9 day of December, 2002.

In the second case, in the Circuit Court

of Houston County, Alabama, State of Alabama,

Plaintiff, Versus Stanley Lee Caudill, Defendant,

CC02-1142, the verdict of the Jury reads as

follows:  We the Jury, find the Defendant, Stanley

Lee Caudill, guilty of Sexual Abuse, First Degree

as charged in the Indictment.  Again, that verdict

is signed by the Foreperson, Mr. Dickerson, and

dated the 9 day of December, 2002.

The Defendant shall approach.

(Thereupon, the Defendant, Stanley Lee

Caudill, accompanied by his Attorney of

Record, the Honorable Jack A. Blumenfeld,

approached the Bench as instructed and the

following proceeding were held, to-wit:)

THE COURT:  The Jury having returned

guilty verdicts in these two cases, CC02-1141, a

guilty verdict of the lesser included offense of

Sexual Abuse, First Degree, it is the judgment of

this Court that you are guilty of said offense.

Do you have anything to say as to why sentence of

law should not be pronounced upon you, at this

time?

THE DEFENDANT:  No, sir.

MR. BLUMENFELD:  Judge, we would request a

Sentencing Hearing.

THE COURT:  Okay.  Again, in CC02-1142,

the Jury having returned a verdict of guilty of

Sexual Abuse, First Degree as charged in the

Indictment, it is the judgment of this Court that

you are guilty of said offense.  Through your

attorney, you are requesting a Pre-Sentence

Investigation and the law says if either side, the

State or the Defense request a Pre-Sentence

Investigation, the Court shall so order it.  And,

it will be done.  Sentencing in these cases is set

for January 10, 2003 at 9:00 o'clock A.M. and

investigation will have to be done into your

background and that investigation will be reported

to this Court.

What says either side concerning bond?

MR. BLUMENFELD:  Your Honor, does the

State want - - - well, judge, since he has been on

bond, since these events occurred; I can't say

allegedly occurred since the Jury has spoken, but

by the victims' own admission, he has made no

threats, no actions towards either one of these

young women since he was indicted.  Since he was

arrested, Your Honor, through waiver of

arraignment, he was present in Court.  Obviously

at Docket Call, he was available for Court.

Obviously he was available for his trial.  He is

not a flight risk.  Your Honor, there is a, this

Court, I know and he should know and he will know,

Your Honor, that this Court does have discretion as to the range of punishment in these cases. Certainly if he does not show up for his Sentencing Hearing, this Court can impose a sentence. It is in his best interest to appear. Judge, obviously the State has not filed any type of prior conviction. He has not been convicted of a felony before. The testimony of the young lady not withstanding, there is nothing in his background with any type of violence, any use of weaponry. There is no reason, judge, to raise his bond. I believe his bond is ten thousand dollars on each case.

Judge Anderson, he has successfully followed through, if you will, Your Honor, of conditions through his bond of being here. Again, judge, there is apparently no report, either from the young women or from law enforcement in Houston County of any type of threat indicator or otherwise. Obviously a part of the condition is to stay away from the family and that will be done. I would ask, judge, that he be allowed to stay on the same bond.

THE COURT: Thank you. Any response from the State?

MR. DAVIS: No, sir. Well, response; yes. I am satisfied with the ten thousand apiece. With the firearms enhancement, the minimum sentence is ten and the maximum sentence is ten. Circuit practice, for years, is one thousand dollars a year. So, I am not opposed to the same bond.

THE COURT: Okay. This is the concern that I have, based on the testimony and now the two convictions. There has been contact and I am a little bit concerned that now that we have the conviction and because there has been contact after these offenses were committed, that there could be some problems. I will continue him on the same bond in that the State has not opposed. But, there will be two additional conditions. Number one, that there will be no contact with these two victims whatsoever. Any contact, direct or otherwise, telephone, through written communications or in person shall subject your client to immediate revocation of that bond and incarceration until sentencing. The second condition; I want him monitored by Community Corrections so that we know his whereabouts.

MR. BLUMENFELD: I am looking around to see if anyone is here.

THE COURT:  You will have to take him over there.

MR. BLUMENFELD:  All right, sir.

THE COURT:  So, with those two conditions then, the bond will remain and sentencing is January 10.  Okay.

MR. DAVIS:  Thank you.

THE COURT:  Thank you all.

(Thereupon, the Trial Jury was discharged from their services in the above styled and numbered causes and the following proceedings were held, to-wit:)

THE COURT:  If there is nothing else, we are adjourned.

PROCEEDINGS CONCLUDED

IN THE CIRCUIT COURT

OF HOUSTON COUNTY

ALABAMA


STATE OF ALABAMA                *
                                *
                                *
VS.                             *     CASE NOS. CC02-1141,1142
                                *
                                *
STANLEY LEE CAUDILL             *



A P P E A R A N C E S:


FOR THE STATE:                  HON. ERIC C. DAVIS
                                Assistant District Attorney
                                Dothan, AL

FOR THE DEFENDANT:              HON. JACK A. BLUMENFELD
                                Attorney at Law
                                Dothan, AL



        On January 10, 2003, beginning at 9:00

o'clock A.M., the above styled and numbered cause

came up for a Sentencing Hearing before the

Honorable Larry K. Anderson as Presiding Judge.

The following proceedings were held in Court Room

A of the Houston County Courthouse Annex, Dothan,

Alabama, to-wit:

THE COURT:  All right.  Stanley Lee

Caudill, sentencing hearing.  Are you ready?

MR. DAVIS:  Yes, sir.

MR. BLUMENFELD:  Yes, sir.

THE COURT:  Mr. Blumenfeld, I will hear

from you concerning sentencing.

MR. BLUMENFELD:  Your Honor, first I do

have this gentlemen that would like to speak on

behalf of Mr. Caudill, to call him to the stand,

please.

THE COURT:  Okay.

MR. BLUMENFELD:  Steve Brophy.

THE COURT:  Okay.


DEFENDANT'S EVIDENCE

Thereupon,

STEVEN EUGENE BROPHY

was called as a witness on behalf of the

Defendant, and after having been first duly sworn,

testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. BLUMENFELD:

Q      State your name, please.

A      Steven Eugene Brophy.

Q      How old are you, Mr. Brophy?

A      Forty-one.

Q      Where do you live and where are you employed?

A      Daleville, Alabama.  I am a self proprietor of
Steve's Furniture and Appliance in Daleville.

Q      Mr. Brophy, you contacted me?  Is that correct?

A      Yes.

Q      You wanted to speak on Mr. Caudill's behalf?
Correct?

A      Yes, sir.

Q      How do you know Mr. Caudill?

A      I have been acquainted with him and worked with
him for probably ten years; eight or ten years.

Q      You told me that you would like to address Judge
Anderson; tell what you know about him and on his
character?  Is that correct?

A      Yes, sir.

Q      Do you understand when we spoke, I told you the
Jury has spoken and whether or not you believe he
is innocent or guilty is not the issue today.  You
are here only to speak about what you know about
Mr. Caudill as a man.

A      Yes, sir.

Q      All right.

A      Judge Anderson, I have worked and been around him
and been a person fried of Stanley Caudill for a

long time.  And, his honor and integrity as a man

has never been questioned by me or by my family.

He is a good man, from what I have seen.  And, he

is, I think his record beforehand speaks for

itself.  He has never been in trouble before.  I

believe in the man whole-heartedly.

THE COURT:  Okay.  Anything else?

THE WITNESS:   Just wish for a little

leniency, please.

THE COURT:  Thank you.  Mr. Davis, any

questions?

### CROSS EXAMINATION

BY MR. DAVIS:

Q      You understand that twelve people sat in that box

and listened to all the evidence in here and they

applied it to the law as the judge instructed and

found him guilty of two counts of Sexual Abuse in

the First Degree.  Do you understand that?

A      Yes, sir.

Q      Does that change your opinion?

A      Not as a man it doesn't.

MR. DAVIS:  No more questions.

THE COURT:  Anything else, Mr. Blumenfeld?

MR. BLUMENFELD:  Not from him, Your Honor.

THE COURT:  Okay.  Sir, thank you very

much for coming.  Watch your step as you leave

your seat there.

(Witness excused.)

MR. BLUMENFELD:  Your Honor, the State, I

believe, filed a notice that they were going to

ask his sentence, that the provision of the law

that requires a punishment due to a firearm being

used to apply in this case.  If that is the case,

Mr. Caudill will be looking at ten years on each

case.  Your Honor, I know the State filed that and

I would ask the Court to take in consideration the

fact, judge, that the testimony from the victims

in this case was that he allegedly said that he

was going to kill members of their family.  They

testified he said that the mafia would be utilized

to kill members of the family, even though that

was the first time that was ever brought up.  In

the statement to the police, they never alluded to

the mafia.  But, be that as it may, they never

indicated, judge, that he threatened them with a

handgun.  So, I would ask the Court to reject the

State's contention that a deadly weapon or firearm

was used in the occurrence of this crime.

Your Honor, looking at this record,

Stanley Caudill is forty-four years old.  He has

no record. Judge, I consider myself a fairly law abiding individual, but if I got in trouble and a probation officer ran a rap sheet on me, they would find some speeding tickets. But, this man has never been in trouble before, Your Honor.

Judge, in regard to punishment, as this Court knows, he will be punished the rest of his life. In regard to his person, he will have to register as a sex offender, he can never be around children. If he meets a woman he is in love with and she had children, he cannot be a part of their life. He has to register. I am not going through the whole litany of things, but he will be punished every day, he will be punished every day for the rest of his life. Your Honor, I would ask this Court to please take in consideration the fact that this man has no record, he is a hard working man. The reports from Mr. Danzey said he was not employed at the time of his arrest. I beg to differ. His employer called me, Mr. Church, because he had trouble locating the truck Stanley was driving in the business but he did find the truck. He was employed and has been employed all his life.

Your Honor, I would just ask, looking at

his record, that this Court take that in consideration. I know you will not give the minimum sentence, but I would ask that the ten years, I know the State will say is mandatory on both sentences, Your Honor, not be applied.

THE COURT: I think it is mandatory, though.

MR. BLUMENFELD: If you believe, judge, that a firearm was utilized.

THE COURT: Okay. Thank you. Mr. Davis.

MR. DAVIS: The Jury has already spoken to the question whether a firearm was utilized or not and that makes the minimum and maximum on each case ten years. The only person - - -

THE COURT: Was there a special interrogatory from the Jury that I failed to note or something where the Jury said there was a firearm involved? I thought they came back with a guilty of a lesser included offense, Sexual Abuse, First Degree and guilty of the other Sexual Abuse, First Degree as charged. I am sorry, I must be missing something here. I don't remember them telling me anything about a firearm.

MR. DAVIS: The only testimony that there was not one came from the Defendant and - - -

THE COURT: You made the statement that
the Jury settled that issue. I am asking you how
did they settle that issue?

MR. DAVIS: Apparently believed the victim
and not Mr. Caudill. He is the only one that
said, he said yes, there was a gun. However, it
was a B-B gun. They apparently disagreed with
that, finding forcible compulsion and believing
the two victims that said the firearm was used.

THE COURT: Forcible compulsion, of
course, I mean there was other evidence that
threats were made regarding the mafia and that can
be forcible compulsion. So, you know, the Jury
has not determined the issue of firearm or not.
But, be that as it may, go ahead.

MR. DAVIS: That would be our position.
It was taken out in Bonifay, shown to them, they
were threatened there, taken into the motel room
where he made the same threats. It was present
each and every stage.

THE COURT: Now, I would tend to agree
with that. I just don't agree with the statement
that the Jury settled that issue. I heard
testimony it was shown to the girls, taken out of
the vehicle and taken into the room. That part

makes sense.

MR. DAVIS:  It was used on each and every
stage where the threats were made.  And, of
course, the compulsion occurred in Bonifay, it
occurred here in Houston County in the motel room
and it would be our position that one, in fact, it
does apply.  And, regardless if he had a previous
record or not, there is not a person in here that
is charged that didn't start at some point with a
clean slate.  Everybody starts with a clean slate
and at some point, each and every one of the
Defendants in here has apparently added to their
clean slate in one form or another.  Everybody
starts somewhere.  So, I would ask you to apply
the ten year firearm enhancement in each and run
the sentences consecutive.

THE COURT:  Mr. Blumenfeld.

MR. BLUMENFELD:  Mr. Davis is correct;
everyone does start with a clean slate.  But, it
is my experience that clean slates are smudged
when someone is sixteen, seventeen, eighteen, not
when you are forty-four years old, Your Honor.  I
do not believe this man is a danger to society.  I
believe the Jury has spoken.  The fact, yes, he
did do some very bad things, he was convicted of

some very bad crimes. I would ask the sentences run concurrent. I would ask further that the probation officer recommended a medium sentence and this Court does impose that. And, I thank you.

THE COURT: I want to hear more about the firearm enhancement. While I disagree with the State that the Jury made some determination, but all they did was find, made a finding of guilt. There was testimony that a firearm was shown to the girls and taken into the room, which is am implied threat.

MR. BLUMENFELD: My understanding - - -

THE COURT: And, I guess what maybe Mr. Davis was saying, although not as articulately as he should have, this Sexual Abuse, First; one was a lesser included offense and one was the original charge. There were two different victims. But, there is a forcible compulsion aspect of that and I think the State traveled on the theory regarding the firearm and the theory of threats of the mafia.

MR. BLUMENFELD: Well, judge, if I remember the testimony of this young lady and the other lady that he threatened their family with

the mafia.

THE COURT:  I do remember the business about firearms, so I want to hear more about that. My understanding, unless you present a case to the contrary, that that provision is mandatory.

MR. BLUMENFELD:  Yes, Your Honor.  Except if Your Honor accepts or believes that the firearm was part of the forcible compulsion.  My memory is that it was a B-B type gun and he took it out of his pocket and didn't want to leave it in the vehicle.  He never threatened the victims with the gun.  The threats, as I remember it, Your Honor, was the threats of hurting the family through the means of the mafia.  I was struck by the fact that they never testified he threatened, victims never said he threatened me, that he threatened their family.

THE COURT:  I understand.

MR. BLUMENFELD:  Even if the Court imposes that, Your Honor, the Court could run the sentences concurrent and I will ask the Court to do so.

THE COURT:  Thank you.  All right. Approach.

(Thereupon, the Defendant, Stanley Lee
Caudill, accompanied by his Attorney of
Record, the Honorable Jack A. Blumenfeld,
approached the Bench as instructed for
sentencing and the following proceedings
were held, to-wit:)

THE COURT:  You are Stanley Lee Caudill?

THE DEFENDANT:  Yes, sir.

THE COURT:  Mr. Caudill, on December 9,
2002, you went to trial on two charges of Rape,
First Degree in CC02-1141 and Sexual Abuse, First
Degree in CC02-1142.  A Jury returned a verdict of
guilty that day of Sexual Abuse in the First
Degree in the one case and then Sexual Abuse,
First Degree, the lesser included offense of Rape,
First Degree in the other case.  It is the
judgment of the Court that you are guilty in both
cases.  Do you have anything to say as to why
sentence of law should not be pronounced upon you
at this time?

THE DEFENDANT:  (Shakes his head to the
negative.)

THE COURT:  Okay.  These are Class C
Felonies and carry a potential punishment or range
of punishment of not less than a year and a day

nor more than ten years.  The State has alluded to

a special provision wherein a firearm is used.  It

is the judgment of the Court that there was

testimony regarding a firearm.  It was shown to

the victims in this case and carried into the

motel room where these events occurred.  It is the

judgment and sentence of this Court in each of

these cases, you be sentenced to the Penitentiary

of the State of Alabama for a term of ten years.

Additionally, you are ordered to pay a fine in

each case of two thousand dollars, an assessment

to the Victims' Compensation Fund in each case of

five hundred dollars as well as cost of court.

          Any restitution, Mr. Davis?

          MR. DAVIS:  No, sir.

          THE COURT:  Okay.  You have forty-two days

from this day to appeal this decision, if you so

choose.  You are in custody.

          MR. BLUMENFELD:  Your Honor, we would ask

that the Court run the sentences concurrent with

each other.

          THE COURT:  Okay.  And, that is denied.

They will run consecutively.

          MR. BLUMENFELD:  Your Honor, we will make

application for probation.

THE COURT: I will hear that now. If y'all will, have a seat.

(Thereupon, a Probation Hearing was held. After that, the following proceedings were held, to-wit:)

MR. BLUMENFELD: Would the Court consider any type of split, Your Honor?

THE COURT: No, sir. We are adjourned.

PROCEEDINGS CONCLUDED

### REPORTER'S CERTIFICATE

STATE OF ALABAMA

HOUSTON COUNTY

      I, William R. Moeglin, Official Court Reporter in and for the Twentieth Judicial Circuit of Alabama, do hereby certify that the above styled and numbered cause was reported stenographically by me and is a true and correct transcript of the testimony, objections, motions, rulings of the Court, oral charge of the Court, As well as the verdict of the Jury and the sentencing of the Defendant and was transcribed by me or under my direction and control.

      I further certify that I have filed all exhibits offered in the trial of this cause, if any, with the Circuit Clerk of Houston County, Dothan, Alabama for incorporation into the Record on Appeal.

      I further certify that I have, on this day, filed with the Clerk of the Court of Criminal Appeals, the Attorney General and the parties here involved, a copy of the Certificate of  Completion of Reporter's Transcript of the said cause.

I further certify that I have filed the original and three copies of this transcript in the office of the Circuit Clerk of the Circuit Court of Houston County, Dothan, Alabama.

Done in office, this the 14th day of April, 2003.


William R. Moegley
OFFICIAL COURT REPORTER

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>169 |

TO: **The Clerk of the Court of Criminal Appeals**     Fax: (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

Criminal Appeals Case Number     CR 02   -  0755

Stanley Lee Caudill                           v. State of Alabama
**Appellant's Name**                            **Appellee**

On appeal from the: [XX] Circuit Court of

[　] District Court of    Houston        County

[　] Juvenile Court of

**Trial Court Case Number**  CC02-1141 & 1142

**Notice of Appeal Date**  1-13-03

I William R. Moeglin                               , certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.   The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the   14th  day of   April            ,  2003   .

William R. Moeglin
Court Reporter

**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

AP 14-3 Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

## CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

Stanley Lee Caudill

Appellant

V.

State of Alabama

Appellee

TO: The Clerk of the Court of
Criminal Appeals of Alabama

Case No. _____ CC-02-1141 & 1142 _____

Date of Notice of Appeal _____ 1-13-03 _____

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by

assembling _____ 79 _____ pages of the Clerk's record, and _____ 169 _____ pages of

the Court Reporter's transcript, and that one copy of each of the record on appeal
has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____ 29th _____ day of _____ April _____ , XX 2002 _____ .

_Judy Byrd_
Circuit Clerk

_____ HOUSTON _____
County